7-19-12



# THE CIRCUIT COURT OF WASHINGTON COUNTY, ARKANSAS

## _____ CIVIL DIVISION

F. ALLAN MIDYETT, M.D.,
Plaintiff

v.                              No. CM2-1657-2

ROBERT LEVY,_____
Defendant

### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

ROBERT LEVY
Department of Veterans Affairs
Medical Center
1100 North College Avenue
Fayetteville, AR 72703


A lawsuit has been filed against you.  The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) — or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas — you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:
    Carole D. Sexton
    Attorney at Law
    4678 Clear Creek Blvd.
    Fayetteville, AR 72704

If you fail to respond within the applicable time period, judgment by default will be entered against you for the relief demanded in the complaint.

**CLERK OF COURT**



Address of Clerk's Office
Washington County Courthouse
280 North College Avenue
Fayetteville, AR 72701

_____

[Signature of Clerk or Deputy Clerk]

Date: _____

[SEAL]

No. _____   This summons is for _____ *ROBERT LEVY* _____
                                        *(name of Defendant)*

## PROOF OF SERVICE

I personally delivered the summons and complaint to the individual at _____
_____[place] on _____ [date]; or

I left the summons and complaint in the proximity of the individual by _____
_____ after he/she refused to receive it when I offered it to him/her; or

I left the summons and complaint at the individual's dwelling house or usual place of
abode at _____[address] with _____[name], a
person at least 14 years of age who resides there, on _____ [date]; or

I delivered the summons and complaint to _____[name of individual],
an agent authorized by appointment or by law to receive service of summons on behalf of
_____[name of defendant] on _____[date]; or

I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served
the summons and complaint on the defendant by certified mail, return receipt requested,
restricted delivery, as shown by the attached signed return receipt.

I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a
copy of the summons and complaint by first-class mail to the defendant together with two
copies of a notice and acknowledgment and received the attached notice and
acknowledgment form within twenty days after the date of mailing.

Other [specify]: _____

I was unable to execute service because: _____

My fee is $ ____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____          By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

IN THE CIRCUIT COURT OF
WASHINGTON COUNTY, ARKANSAS

F. ALLAN MIDYETT, M.D.                                              PLAINTIFF

v.                                    CASE NO. CV12-1657-2

ROBERT LEVY                                                        DEFENDANT

## COMPLAINT

COMES NOW, F. ALLAN MIDYETT, M.D., Plaintiff, and asserts the following causes of

action against Robert Levy, Defendant, to wit: defamation, slander, libel, tortious interference with

business expectancies, harassment, willful violation of public laws and policies, and is asking for

immediate injunctive relief to immediately halt these malicious acts which are causing irreparable

harm as well as compensatory, consequential, and punitive damages.  This is a state action for

tortious damages.  Under the Arkansas Rules of Evidence, particularly Rule 302: *In civil actions and

proceedings, the effect of a presumption respecting a fact which is an element of a claim or defense

as to which federal law supplies the rule of decision is determined in accordance with federal law.*

### PARTIES

1.     Plaintiff F. Allan Midyett, M.D., is and was at all times relevant to this case a citizen and

resident of the County of Washington, State of Arkansas residing at 4678 Clear Creek Blvd.,

Fayetteville, AR 72704.

2.     Defendant Robert Levy is and was at all times relevant to this case employed at 1100 North

College Avenue, Fayetteville, AR 72703 and may be served there with process.

1

## BACKGROUND FACTS

3.     Plaintiff F. Allan Midyett, M.D., was employed by the V. A. of the Ozarks as a neuroradiologist and listed as such on their website. See Exhibit 8 attached hereto and incorporated herein. The V.A. of the Ozarks must be very proud of having employed Plaintiff Dr. Midyett as a neuroradiologist because they are continuing to list him as a neuroradiologist on their website. According to the last reported statistics by AJNR, there are only 2,153 practicing neuroradiologists in this country. Further, Plaintiff Dr. Midyett was the only neuroradiologist in residence at that facility. A neuroradiologist is a highly skilled medical professional who has obtained additional fellowship training after having completed residency. This additional fellowship training is recognized by the American Board of Radiology as Certificate of Added Qualification and recognizes this person as a subspecialist. Further, Dr. Midyett was the author of multiple chapters in imaging of the manual referred to as <u>Current Protocols in Magnetic Resonance Imaging</u>. The immediate 12 years of Plaintiff Dr. Midyett's practice before becoming employed by V.A. of the Ozarks was neuroradiology and the teaching of neuroradiology.

4.     On or about April 21, 2011, Plaintiff F. Allan Midyett, M.D., initially disclosed serious radiology misses and errors made in the Department of Radiology of the V.A. of the Ozarks (hereinafter referred to as "VA"). As set forth in Exhibit 2 attached hereto and incorporated herein. This initial list comprised hundreds of errors and misses and was documented by photographic evidence of such things as mistaking a tumor for an external jugular vein. The discovery and report of these errors was in compliance with all HIPAA regulations as well as all other laws. Instead of taking steps to correct these errors and misses and thus benefit the patients, Plaintiff was directed to erase all evidence of these errors. The IT Department associated with the V.A. of the Ozarks

2

inspected Plaintiff's computer, cell phone and camera to insure that all of these documented errors had, indeed, been erased. No corrective actions were taken to benefit the patients. At this point in time, the facility was on notice of the published policies of the Department of Veterans Affairs regarding retaliation and reprisal.

5.     On October 20, 2011, Plaintiff F. Allan Midyett, M.D., found a radiology miss that had gone undetected and unreported by multiple other radiologists for nine (9) years. See Exhibit 6 attached hereto and incorporated herein. Mere hours after this discovery, the Chief of Radiology launched a virulent attack against Plaintiff in violation of the stated policies of the Department of Veterans Affairs, the No FEAR Act of 2002 - Public Law 107-174), the Whistleblower Protection Act, Title 5 Chapter 33, as well as 5 USC Sections 2301 and 2302. See Exhibits 9 and 10 as to VA stated policies. Additionally, this violates Executive Order 13518. At that time, another radiology supervisor acknowledged in writing awareness of public law and put in writing it was not possible for this VA to violate public law without stating any legitimate reason for making this ludicrous statement. Less than one month later, the Chief of Radiology went on a wild rant which is recorded on audio threatening Plaintiff Dr. Midyett with many repercussions in violation of stated public policies and laws as well as the published policies of the Department of Veterans Affairs. This recorded rant, while quite chilling, is indicative of the nature and character of the person ranting.

6.     Dr. Midyett's wife had been diagnosed with ovarian cancer in late July, 2011. She had to undergo chemotherapy, after having had major surgery to remove the tumor, at Highland Oncology and had a very difficult time with this eventually resulting in the termination of the chemotherapy before a full course of the treatment. See Exhibit 4. Even though Dr. Midyett asked for time off to be with his wife for medical reasons, Dr. Midyett was denied this in violation of both the Family

3

Medical Leave Act and the Master Agreement by and between the Department of Veterans Affairs and the American Federation of Government Employees for 2011. See Exhibit 5 attached hereto and incorporated herein.  A mere four (4) days after the hysterical rant of the Chief of Radiology, Highland Oncology determined they could no longer sustain chemotherapy treatment of Dr. Midyett's wife, that it was simply too debilitating and life-threatening.  Stress is a well known exacerbating factor in cancer. This exacerbating factor has now caused Plaintiff Dr. Midyett's wife to have to be treated for a complex biochemistry disorder complicated by neuropathy as just one of the effects and is a lifelong disease exacerbated by undue stress occurring during the course of chemotherapy.  This disease has fatal side effects for those so diagnosed and these are well known to medical personnel of all levels.  Plaintiff has labile hypertension and was prescribed medications for this by the pharmacy at V.A. of the Ozarks.  Exacerbating Plaintiff's already existing condition with undue stress could cause Plaintiff to suffer a stroke and/or cardiovascular event.  This act was a blatant disregard for the health and well-being of both Plaintiff Dr. Midyett and another person and these were reasonable and foreseeable consequences.

7.      On August 30, 2011, Plaintiff Dr. Midyett's mother died in his arms.  Plaintiff Dr. Midyett was expected to work that day and was never given any time off for bereavement.  This is merely cumulative evidence of continued and on-going violations of the Master Agreement,  5 USC Sections 2301 and 2302, and the stated policies of the Department of Veterans Affairs.

8.      Plaintiff Dr. Midyett's work day was mandated by Gary Eagle, RT Supervisor, to begin at 8:00 a.m. and end at 4:30 p.m.  There was no provision for him to begin work at any time prior to 8:00 a.m.  The Chief of Radiology was well aware of this.  Under Article 21 of the Master Agreement by and between Department of Veterans Affairs and the American Federation of

4

Government Employees for 2011 any change in the administrative workweek and changes in the regularly scheduled workweek are considered changes in conditions of employment. Plaintiff Dr. Midyett has never been provided in writing of any notification of any change in his workweek as provided by Article 21. Plaintiff Dr. Midyett has certainly not signed any agreement to altering his workweek. Therefore, any alleged cases performed before the beginning of his regular work hours are the responsibility of the Chief of Radiology and not Plaintiff. Defendant is charged with knowledge of the Master Agreement and its provisions. To make any finding against the provisions of the Master Agreement is malice and fraud. To fail to make a diligent investigation after an EEO Complaint has been filed is in pari delicto with the retaliation and reprisal of the Chief of Radiology thereby making any finding by the Defendant malice and fraud. A reasonable, ordinary, prudent person would have abided by the stated policies of both the Department of Veterans Affairs and the Master Agreement and refused to join in retaliation and reprisal.

9.      The Chief of Radiology, knowing Plaintiff's family situation and acknowledging in writing that Plaintiff's wife was undergoing chemotherapy, stated there was no reason for Plaintiff Dr. Midyett not to work overtime. This is merely cumulative of the on-going violations of the Master Agreement, 5 USC Sections 2301 and 2302, Title 5 Chapter 33, the hostile work environment, the discrimination against that class of persons known as veterans of whom Plaintiff is one, and the stated policies of the Department of Veterans Affairs.

10.     On or about December 19, 2011 Plaintiff Dr. Midyett hand delivered to the Chief of Staff and to the Facility Director, via his secretary, an additional list of 116 serious radiology misses ranging from intracranial arteriovenous malformations and intracranial hemorrhages to multiple types of cancer and clearly showing the radiology miss that he had found on October 20, 2011 that

5

had gone undetected by multiple radiologists for nine (9) years. See Exhibit 6 attached hereto and incorporated herein.  This was not an exclusive list. This listing was a casually compiled listing. This suggests that an audit of the radiology department by qualified subspecialists  would undoubtedly reveal many, many more and far more serious errors.  This is further buttressed by the very words of the Chief of Radiology vehemently refusing to have any subspecialization in the Department of Radiology.  This  further evidences the intent of the Chief of Radiology to refuse to correct or reduce radiology errors to the detriment of the health and well-being of the patients of V.A. of the Ozarks who are veterans who have served their country as has Plaintiff Dr. Midyett who is a member of that class known as veterans. This demonstrates an unacceptable animosity toward a particular class, i.e., veterans and particularly veterans with a disability.  Plaintiff is a member of this class. The Chief of Radiology failed and refused to take any action in regard to this list of errors just as she had failed and refused to take any action regarding the April 21, 2011 list of hundreds of errors. This violates the published policy of the Department of Veterans Affairs.  On December 23, 2011, Plaintiff Dr. Midyett filed an EEO complaint against the Chief of Radiology for failure to make reasonable accommodation for a recognized disability, harassment, hostile work environment, discrimination based on age and sex, and retaliation. See Exhibit 1 attached hereto and incorporated herein. Plaintiff Dr. Midyett was the only veteran who was a radiologist working in the Department of Radiology of the V. A. of the Ozarks. See Exhibit 7 attached hereto and incorporated herein. See also Title 5 Chapter 33. The Plaintiff Dr. Midyett is a member of the same class, i.e., a veteran with a known disability, that  the Chief of Radiology had on both April 21, 2011 and December 19, 2011 failed and refused to act to help in accordance with accepted medical practices, public laws and policies, the stated and published policies of the Department of Veterans Affairs, and the Master

6

Agreement. In fact, the Chief of Radiology states on the audio tape that she will do nothing at all in compliance with the laws, policies and/or collective bargaining agreement. The facility had already been put on notice of Plaintiff's EEO claim by the October 20, 2011 written statement of RT Supervisor Gary Eagle wherein he writes: he was put on notice of the "the Act of _____" and his saying I know the law. This statement was made regarding the rant made by the Chief of Radiology after the disclosure of the radiology miss by Plaintiff on October 20, 2011 that had gone undetected and uncorrected for nine (9) years by multiple radiologists. This is detrimental to the health and well-being of the class of persons known as veterans of which Plaintiff is a member. This audio tape could have been produced for Defendant to consider had Defendant complied with Title 5 Chapter 33 or in any way complied with the No Fear and/or Whistleblower Protection Act, but Defendant has consistently failed and refused to do so. Defendant has chosen to act in pari delicto with the Chief of Radiology.

11.     Less than one month after Plaintiff filed his EEO Complaint in reliance upon the published policies of the Department of Veterans Affairs, the Chief of Radiology, in violation of the No FEAR Act of 2002 - Public Law 107-174), the Whistleblower Protection Act (5 U.S.C. Sec. 2302 (b) (8), Title 5 Chapter 33, 5 USC Sections 2301 and 2302, and the published policies of the Department of Veterans Affairs., launched a fabricated, malicious, vindictive attack against Plaintiff. This was done in retaliation and reprisal and the very wording of the statement evidences this. A reasonable, prudent person reading this statement could readily see this statement was made in retaliation and reprisal in that it makes multiple violations of Article 27 of the Master Agreement; it acknowledges the Chief of Radiology was put on notice of Plaintiff's EEO claim and wholly and completely disregarded it in violation of the published policy of the Department of Veterans Affairs; the Chief

7

of Radiology states she is shifting blame for the hostile environment to the Plaintiff after acknowledgment of the EEO complaint for hostile environment.  This is retaliation on its face. This very fact is self-evident this entire document is made in retaliation and would have put a reasonable, prudent person on notice.  Just one example of the fallacious assertions made in this statement is: "Moreover, he [Plaintiff Dr. Midyett] left the department at the end of the day while a GI was still being done on a patient, ostensibly under his supervision, before all images were completed or reviewed."  The Chief of Radiology knew this to be a patent falsehood.  The rectal lesion was plainly visible from the CT of the day before which that radiologist had clearly missed.  The patient was having  difficulty with the procedure.  The diagnosis was clear.  Plaintiff met with the treating physician and pointed out what should have been diagnosed the day before and saved the patient an unnecessary and painful procedure which the Chief of Radiology was more than willing to force the patient to endure. What this specific statement further demonstrates is the length to which the Chief of Radiology went to fabricate.   The Chief of Radiology in a typical demonstration of her dislike for veterans and some radiology procedures has chosen to misrepresent this making this is a knowing and malicious misrepresentation.  She also complained that because Plaintiff has a CAQ in neuroradiology she felt it was unfair for him to read neuro.  It was too easy for him. She preferred to have lesser trained radiologists continue to make errors than to have the patients have the best possible care.  This evidences her attitude regarding that class of persons known as veterans.  Her statement shouts this attitude as well as the attitude of retaliation and reprisal.   She routinely made derogatory comments regarding veterans and certain radiology procedures.  Plaintiff is member of the class known as veterans.  The statements made by the Chief of Radiology in her January 20, 2012 written document could not be more self-serving if they were put on a platter.  These statements

8

alone are sufficient to have put Defendant on notice that the published policies of the Department of Veterans Affairs regarding retaliation and reprisal were being flagrantly violated. There are multiple violations of the Master Agreement and public laws violated in writing by the Chief of Radiology documented in that one single document. A reasonable, prudent person would have done nothing further in violation of these published policies. It would have be a simple thing for Defendant to say let me see the CT from the day before so that he could verify for himself that the lesion was plainly visible. One did not even have to a general radiologist to ascertain it. By continuing in his acts, Defendant has put himself in pari delicto with the Chief of Radiology in violation of the published policies of the Department of Veterans Affairs prohibiting "retaliation and reprisal against Federal employees for opposition to discrimination, or participation in the discrimination-complaint process" which "is unlawful and will not be tolerated". See Exhibits 9 and 10. Defendant has acted with malice and fraud. A reasonable, prudent person would not have proceeded as did Defendant. A reasonable, prudent person would have made diligent inquiries as to the motives of the Chief of Radiology and asked for Plaintiff's input. A reasonable, prudent person would have taken one look at the January 20, 2012 written document by the Chief of Radiology and immediately have realized this was documented proof of retaliation in hard, cold, extrinsic evidence. Defendant failed and refused to do this and thus acted in pari delicto. Defendant acted with malice and fraud.

12.   The Defendant Robert Levy is charged with having to know, or reasonably should have known, of these facts and circumstances. A reasonable, prudent person in his position as alleged "Professional Standards Board Chairperson" would have special knowledge of the consequences of his actions and, further, should have been aware of this rant of the Chief of Radiology as part of

the information necessary for a fair and impartial hearing, and should have been put on notice of

likely repercussions from this fabricated, malicious, vindictive attack made in violation of multiple

public laws and policies. Defendant had the V.A. attorney defending this EEO Complaint sitting at

the table with him. A reasonable, prudent person would question the fabricated, malicious,

vindictive actions of a person named in an EEO Complaint for a hostile environment, harassment,

and retaliation made against a physician with 45 years of radiology practice and not a single

complaint made against him. A reasonable, prudent person would question the fabricated, malicious,

vindictive actions of a person made against the author of multiple cerebral imaging chapters in

Current Protocols in Magnetic Imaging. A reasonable, prudent person would question the fabricated,

malicious, vindictive actions of a person alleging that a CAQ neuroradiologist should be performing

any other medical work than his subspecialty, particularly when there are few neuroradiologists in

practice compared to the other subspecialties. Defendant had the V.A. attorney familiar with this

EEO Complaint sitting at the table with him. A reasonable, prudent person would be aware of

applicable public laws and public policies and would have acted within those laws and policies. A

reasonable, prudent person in the same or similar position as the Defendant should have reasonably

known his actions could subject the V. A. of the Ozarks to multiple legal actions including but not

limited to negligent hiring of the Chief of Radiology, negligent retention of the Chief of Radiology,

negligent supervision against the Chief of Radiology, violations of No FEAR Act of 2002 - Public

Law 107-174, the Whistleblower Protection Act (5 U.S.C. § 2302 (b) (8), Title 5 Chapter 33, 5 USC

Section 2302, as well as multiple violations of the Master Agreement. A reasonable, prudent person

in the same or similar position as the Defendant should have reasonably known that by subjecting

the V. A. of the Ozarks to multiple legal actions these multiple legal actions would become a matter

of public record and some of the patients affected by this would then look to legal redress. This is acting adverse not only to Plaintiff but to the Department of Veterans Affairs. A reasonable, prudent person in the same or similar position as the Defendant should have reasonably known that the Plaintiff is not a public figure and, therefore, the violation of public laws and public policies in making slanderous, libelous, and defamatory statements could be evidence of malicious intent. A reasonable, prudent person in the same or similar position as the Defendant should have reasonably known that the attorney familiar with the EEO Complaint filed by the Plaintiff against the Chief of Radiology was Gayle Sipes and, therefore, made inquiry as to the public laws and public policies set forth by the Department of Veterans Affairs, particularly as to retaliation and reprisal. See Exhibits 9 and 10. These policies are made known to all employees of the Department of Veterans Affairs. As an employee himself, the Defendant is charged with knowledge of these policies. A reasonable, prudent person in the same or similar position as the Defendant should have known that A.C.A. 20-9-502 does not provide immunity for any person acting with malice or fraud and, therefore, taken particular care. There is a maxim of the law that we are all charged with knowledge of the law. Every young person in traffic court rapidly becomes aware of this maxim.

13.     In Parkman v. Hastings, 531 S.W. 2d, 259 Ark. 59 (Ark. 1976) the Court states: "Black's Law Dictionary defines defamation, libel and slander as follows:

'DEFAMATION: The taking from one's reputation. The offense of injuring a person's character, fame, or reputation by false and malicious statements. The term seems to include both libel and slander.

14.     In the oft cited case of Braman v. Walthall, 215 Ark. 582, 225 S.W.2d 342 (Ark., 1949): "If it is shown . . . by evidence outside of the communication. . . that the statements . . .went beyond the

11

subject-matter or purpose of the agency or business . . . then no protection will arise against the prosecution . . .Such intrinsic or extrinsic evidence would show a want of good faith, and would repel the inference that there was no malice." In Gaines v. Belding, 56 Ark. 100, 19 S.W. 236, the court said: 'Where the words spoken are actionable per se, prima facie the law implies malice'".

15.     Defendant knew, or reasonably should have known,  the Chief of Radiology had a long and demonstrated history of fabrication in that she has previously held herself out as a "neuroradiologist" with no fellowship training as well as an "interventional radiologist" and a "pediatric radiologist". See Exhibit 11 attached hereto.  The Chief of Radiology obviously has no concept of fellowship training nor the expertise it is designed to provide.  The American College of Radiology and the American Board of Radiology are well aware of the concept of fellowship training and the special expertise it provides as are all accredited  radiology training programs. Study after study since the pioneering study begun by Dr. L. Henry Garland in 1944 has repeatedly demonstrated that subspecialization is more accurate than general radiology and reduces errors.  The Chief of Radiology was charged with this knowledge and willfully chose to act against this making her actions adverse to the best interests of the V.A. as well as Plaintiff and all other veterans.  It was incumbent upon the Defendant to investigate this person and her allegations to determine whether there could be violation of the veteran's preference.  A reasonable, prudent person in the same or similar position would have made this investigation and  been put on notice. Defendant had a duty to inquire, most especially after the filing of the EEO Complaint.  Defendant had a duty not to participate in what the published policy of the Department of Veterans Affairs calls "unlawful and will not be tolerated".  Defendant disregarded this policy.  This is malice.  Defendant is not a radiologist, much less a neuroradiologist. How did Defendant purport to have any frame of reference

12

according to the nationwide standard for neuroradiology practice recommended by the American College of Radiology without a neuroradiologist being present on the panel and at the hearing? With no basis on which to refer radiology standards as set by the very institution which sets the recommended standard - the American College of Radiology - how did Defendant purport to understand the parameters?  The American College of Radiology has stated that 94% of all radiologists practice in a subspecialty and has accordingly changed the Maintenance of Certification for general radiologists to only the four (4) areas of subspecialty in which that radiologist generally practices.  Was this information even considered?  This is tantamount to saying a pathologist should work as an obstetrician because he may have delivered  babies while in medical school and/or internship. Would a pathologist refuse to allow a neuropathologist in his department to perform work in his subspecialty because "it is low hanging fruit"?  Further, if he did, how would the pathologist justify this act as being in the best interest of patient care?  It simply does not equate.  This is malice and fraud and puts Defendant in pari delicto with the Chief of Radiology in violating the No Fear, Whistleblower Protection Act, 5 USC  Section 2302, Title 5 Chapter 33, the Master Agreement, and the published policies of the Department of Veterans Affairs.

16.    Because the Defendant should have taken notice by Plaintiff's filing the EEO Complaint of the vicious and predatory nature demonstrated by the Chief of Radiology in knowingly violating both public laws and public policies as well as the published policies of the Department of Veterans Affairs, the Defendant was under an obligation to make a thorough and diligent investigation before making any statement, oral or written, adverse to the Plaintiff.  Defendant wholly and completely failed to do this.  Had Defendant made the most cursory investigation he would have immediately known of the facts, laws and policies and not made slanderous, libelous, defamatory statements

13

adverse and inflammatory to the Plaintiff which statements have also made his interests adverse to the best interests of the V. A. of the Ozarks and the Department of Veterans Affairs.  Plaintiff anticipates among those persons who will be necessary and indispensable witnesses are Mark Enderle, John Henley, Gayle Sipes, Kathryn Witztum,  Drake Ripplemeyer, Victoria Major, Jerry Duncan, Gary Eagle and others.  This list is not limiting but does include those named.

17.     Because Defendant knew, or reasonably should have known, that his actions were in contravention of both public laws and public policies any monies expended for or on his behalf that could be traced to public funds would evidence  gross mismanagement of taxpayer dollars as well as abuse of authority and  violation of almost every other section of both 5 USC Sections 2301 and 2302 and Title 5 Chapter 33.  This would only further evidence wrong doing and a collaborative effort to disguise wrong doing in violation of the Secretary's stated policies prohibiting retaliation and reprisal.

18.     The Defendant knew, or reasonably should have known, that any retaliatory action was barred by the policies of the Department of Veterans Affairs [see Exhibits 9 and 10], the No FEAR Act of 2002 - Public Law 107-174) and the Whistleblower Protection Act (5 U.S.C. Sec. 2302 (b) (8).  The Defendant knew, or reasonably should have known, that the V.A. of the Ozarks held out on their own website that Plaintiff Dr. Midyett was a neuroradiologist, a highly skilled medical professional with advanced training.  Plaintiff was  listed as a neuroradiologist during 2010, 2011, 2012 and still is so advertised as of the filing of this Complaint.  See Exhibit 8.  The Defendant as a medical professional himself knew or should have known that highly skilled medical professionals obtain specialized training in order to  practice in that subspecialty.  These individuals endeavor to enhance that area of subspecialty practice and most do not routinely practice outside of that subspecialty.  The

14

Defendant knew, or reasonably should have known, the Plaintiff authored multiple cerebral imaging chapters in <u>Current Protocols of Magnetic Resonance Imaging</u>. A reasonable, prudent person in the Defendant's position would have had this elementary information.  The Defendant knew, or reasonably should have known, that the Plaintiff Dr. Midyett had disclosed a list of serious radiology misses not once but twice.  The second list comprised 116 errors showing  one of those errors occurring on October 20, 2011 and it had been missed on multiple occasions by multiple radiologists for nine (9) years.  See Exhibit 6.  The Defendant knew, or reasonably should have known, this was a serious pattern of medical errors by the Department of Radiology of the V.A. of the Ozarks which was and is continuing to cause physical harm to the health and well-being of to that class of persons known as veterans of which Plaintiff is a member as well as others.  The Defendant knew, or reasonably should have known, the Plaintiff Dr. Midyett is a Viet Nam era veteran [see Exhibit 7] and was the only radiologist in the Department of Radiology of the V.A. of the Ozarks who is a veteran.  Because Plaintiff Dr. Midyett is a Viet Nam era veteran, he has always gone the "extra mile" to provide exceptional care to all patients.  His multi-page CV (curriculum vitae) exemplifies this.  The Defendant knew, or reasonably should have known, it is a stated policy of the Department of Veterans Affairs to hire and retain veterans.  The Defendant knew, or reasonably should have known, that his false, malicious, defamatory, libelous and slanderous statements would and have caused irreparable harm to the Plaintiff.   The Defendant knew, or reasonably should have known, that by making these false, malicious, defamatory, libelous and slanderous statements, the Defendant would put himself adverse to the best interests of the Department of Veterans Affairs as well as to the V. A. of the Ozarks.  The Defendant knew, or reasonably should have known, that his actions could subject the V. A. of the Ozarks to multiple legal actions including actions by the patients for

15

damages and that these actions could be termed as gross negligence due to the violations of multiple public laws and published policies associated with the disclosure of hundreds of medical errors which were not properly addressed when disclosed. The Defendant knew, or reasonably should have known, that by making these false, malicious, defamatory, libelous and slanderous statements that employees of the V.A. of the Ozarks as well as the Department of Veterans Affairs would become necessary and indispensable witnesses against him. The Defendant knew, or reasonably should have known, that at least one supervisor of the V. A. of the Ozarks has admitted in writing to being aware on October 20, 2011 of Plaintiff's legal and ethical claims. The Defendant knew, or reasonably should have known, the Chief of Radiology admitted in writing to being aware of the EEO claims of Plaintiff on October 20, 2011 and willfully disregarded these claims in violation of the published policies of the Department of Veterans Affairs. The Defendant knew, or reasonably should have known, this was an act of retaliation and reprisal in violation of the published policies of the Department of Veterans Affairs by the Chief of Radiology. The Defendant knew, or reasonably should have known, that with this notice in writing by the Chief of Radiology the Defendant would put himself in pari delicto with her retaliatory actions. The Defendant knew, or reasonably should have known, that by making these false, malicious, defamatory, libelous and slanderous statements, the Defendant would bring ridicule upon both the Department of Veterans Affairs as well as to the V. A. of the Ozarks. The Defendant made these false, defamatory, libelous and slanderous statements in reckless disregard for the truth and in furtherance of harassment for Plaintiff's having exercised his legal rights and ethical duties. Defendant knew or reasonably should have known that his statements were in contravention of the stated recommended standards set by the American College of Radiology and the American Board of Radiology. The Defendant made

16

these false, defamatory, libelous and slanderous statements in reckless disregard for the truth after Defendant already knew that another facility had made a job offer to the Plaintiff. Defendant made these false, defamatory, libelous and slanderous statements to tortiously interfere with business opportunities of the Plaintiff Dr. Midyett. Defendant knew, or reasonably should have known, that his false, defamatory, libelous and slanderous statements would and are continuing to tortiously interfere with Plaintiff's business opportunities. Defendant has taken no action to ameliorate these false, defamatory, libelous and slanderous statements thereby making them willful malice. There are very few neuroradiologists practicing medicine in this country and most medical facilities highly prize such neuroradiologists instead of viciously attacking them. The Defendant made these false, defamatory, libelous and slanderous statements in reckless disregard for the truth in an attempt to intimidate the Plaintiff for having exercised his legal rights and ethical duties at a time when Defendant knew, or reasonably should have known, that Plaintiff was having to care for his wife with ovarian cancer. This goes beyond outrage.

19.    Plaintiff repeatedly attempted to put Defendant on notice of these false, defamatory, libelous and slanderous statements, but Defendant arrogantly refused to listen. Defendant was advised of the law by a well known attorney who regularly practices before The Supreme Court of the United States thus making Defendant's disregard of the law inexcusable. There are few attorneys in the State of Arkansas more well versed in the law of civil rights than John Wesley Hall, yet Defendant failed and refused to listen. Thus, Defendant made these statements in willful malice. All Defendant had to do was turn to the person sitting at the table with him, attorney Gayle Sipes, to know that he was in violation of the stated policies of the Department of Veterans Affairs as well as public laws. Defendant failed and refused to do so. An attorney is admonished in the preamble to the Code of

17

Professional Conduct to avoid even the appearance of impropriety. For attorney Gayle Sipes to have failed to mention the EEO Complaint would bring into question legal ethics and no attorney would want to do that. Defendant had legal advice at the table with him and continued to violate the stated, published policies of the Department of Veterans Affairs and public laws. See Exhibits 9 and 10. This is malice and fraud.

20.     Defendant knew, or reasonably should have known, that Plaintiff's wife was diagnosed and being treated for ovarian cancer. Ovarian cancer is deemed to be one of the deadliest cancers a woman can suffer by the American Cancer Society and requires expensive medical treatment. Defendant cunningly calculated his actions to cause the maximum amount of physical and emotional harm to the Plaintiff by tortiously interfering with business opportunities of Plaintiff Dr. Midyett and thereby causing further medical harm to his wife by the denial of the monetary resources for necessary and vital medical care. As a medical doctor himself, Defendant would be keenly aware of the physical, emotional and financial harm he was inflicting in contravention of the published policies of the Department of Veterans Affairs as well as public law. This is the definition of outrage both legally and morally. Defendant (1) intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilized community; (3) the defendant's actions were the cause of the plaintiff's distress; (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it. These are the elements of outrage as enumerated in Cesena v. Gray, 316 S.W.3d 257 (Ark. App., 2009). This Defendant intended to inflict the maximum amount of emotional distress possible when he made his false, misleading, defamatory, libelous and slanderous statements. Defendant's

conduct was extreme and outrageous in that Defendant knew, or reasonably should have known, he was in violation of one or more laws as well as public policies, agreements and the published policy of the Department of Veterans Affairs. The Defendant's actions are a direct and proximate cause of great emotional distress as well as physical distress to the Plaintiff who has had to have his medications quadrupled. No reasonable person should be expected to suffer from frivolous actions in violation of public laws and policies when a reasonable, ordinary, prudent person would not have taken the actions done by Defendant. Further, any reasonable, prudent person could foresee that failing to act within the bounds of public laws, public policies and the published policies of the Department of Veterans Affairs could cause harm to the one against whom he/she is acting. Any reasonable, prudent person would heed advice rendered by a well known, highly respected legal authority. The correlation would be to discount the medical advice of Dr. Denton Cooley regarding a cardiovascular problem in favor of Dr. John Doe, family medicine doctor in a "doc in the box". This is a willful and malicious act done with forethought and disregard for both the truth and the consequences not only to the Plaintiff but to others.

21.     Defendant's wife is now being treated for a condition precipitated by unusually high levels of stress occurring during chemotherapy. This complex biochemistry disorder complicated by neuropathy requires treatment that is quite expensive even with the most comprehensive insurance coverage and this condition can be fatal. Defendant as a physician himself would have special knowledge that this was a foreseeable consequence and acted in reckless disregard for the truth and consequences.

22.     Under the Palsgraf theory of reasonably foreseeable consequences as interpreted by the Arkansas Courts: "The question, however, is not whether a defendant could have reasonably foreseen

19

the exact or precise harm that occurred, or the specific victim of the harm. See <u>Wallace v. Broyles</u>,

supra. It is only necessary that the defendant be able to reasonably foresee an appreciable risk of

harm to others." <u>Coca-Cola Bottling Co. v. Gill</u>, 100 S.W.3d 715, 352 Ark. 240 (Ark., 2003). In

Justice Cardozo's immortal words "conduct becomes negligent only as it gives rise to an appreciable

risk of harm to others."  Defendant knew, or reasonably should have known, that his false,

defamatory, libelous and slanderous statements would cause irreversible harm not only to Plaintiff

but to others in that Plaintiff had already disclosed more than 116 serious radiology errors and

Defendant made his false, defamatory, libelous and slanderous statements in reckless disregard of

both public laws and public policies as well as the published policies of the Department of Veterans

Affairs. See Exhibits 9 and 10.   This is reckless disregard for the public welfare as well as reckless

disregard for harm to Plaintiff and others.  This a breach of duty of care that an ordinary, reasonable

person would exercise in that a reasonable, ordinary, prudent person would not disregard both public

laws and public policies.  This is reckless disregard for the truth and consequences.

23.     Defendant Robert Levy made false, defamatory, libelous and slanderous statements knowing

these statements would cause a report to be made to the National Practitioner's Data Bank.  See

Exhibit 3 attached hereto and incorporated herein.  Any reasonable, prudent investigation as to the

facts of this matter would have made known the history of this matter and estopped this action.  This

was a retaliatory action to further harass and intimidate and for no other legitimate reason.  See

Exhibits 9 and 10.  The Defendant knew, or reasonably should have known, the Plaintiff had been

admonished by Gary Eagle, RT Supervisor, not to read cases performed before 7:00 a.m. Therefore,

to attempt to find fault with Plaintiff for failing to read multiple cases performed before 7:00 a.m.

is merely cumulative of Defendant's malice and fraud.  A reasonable, ordinary, prudent person in

the position of Chairperson of such a panel would have made all necessary inquiries and not just "rubber stamped" a fallacious, fabricated, vindictive attack made in obvious retaliation and reprisal for an EEO Complaint having been filed for hostile work environment, discrimination, and retaliation for reporting multiple serious radiology errors. This vindictive, fabricated, fallacious attack is specifically prohibited by not only public laws and policies but also the published policies of the Department of Veterans Affairs. See Exhibits 9 and 10. Further, a reasonable, prudent person in Defendant's position would have made inquiry as to the recommended standards set by the American College of Radiology for Plaintiff as he is described on the website of the V.A. of the Ozarks and further made inquiry of the practices of the Chief of Radiology. For under the recommended standards set by the American College of Radiology for the Chief of Radiology to have made any complaint against the Plaintiff, the Chief of Radiology is equally at fault under negligent supervision. Any reasonable, prudent chairperson would known this and have acted accordingly. Defendant is in pari delicto with the Chief of Radiology and in equal violation of the published policies of the Department of Veterans Affairs, the No Fear Act, the Whistleblower Protection Act, Title 5 Chapter 33, and 5 USC 2302. Defendant himself should be reported to the NPDB for these reckless acts.

24.     Defendant knew, or reasonably should have known, that by making these false, defamatory, libelous and slanderous statements he would have a negative and chilling impact upon all persons who might step forward to disclose improprieties and wrong-doing in direct reliance on the No FEAR Act of 2002 - Public Law 107-174), the Whistleblower Protection Act (5 U.S.C. Sec. 2302 (b) (8) and 5 USC Sections 2301 and 2302 and the V.A.'s stated published policies. This is in direct contravention of the stated public policy of the Secretary of Department of Veteran's Affairs. See

21

Exhibits 9 and 10. Defendant did this with all malice aforethought. Defendant made these false, defamatory, libelous and slanderous statements against the Plaintiff to set an example of how much harm could befall any person who relied upon public laws and public policies, to establish that disregarding public laws and public policies could go unredressed, and to flaunt public welfare as well as to maximize the physical, financial, and emotional harm to Plaintiff for having exercised his legal rights and ethical duties. This is an unabashed direct flagrant contempt of the judicial system and social morals. This is saying I do not have to follow the law and there is nothing you can do about it! In fact, that is exactly what was said in exactly those same words to Plaintiff Dr. Midyett. Defendant knew, or reasonably should have known, this was said to Plaintiff Dr. Midyett in that sitting at the table with him was the attorney with knowledge of the EEO Complaint.

25.    Defendant willfully and knowingly disregarded and violated both the American College of Radiology recommended standards and the American Board of Radiology recommended standards to make these false, defamatory, misleading, libelous and slanderous statements. Because Defendant chose to ignore and disregard the disclosure of the second list of 116 serious radiology errors, this would tend to show a pattern of reckless disregard for patient welfare prevalent throughout the entire facility. Because of the disregard for public laws and public policies, this would tend to show an accepted pattern of behavior to severely hinder the reporting of this reckless disregard for patient welfare. Because of Defendant's actions and failure to abide by the nationwide recommended standards of the ACR and ABR as well as the stated published policies of the Department of Veterans Affairs plainly stating "retaliation and reprisal against Federal employees for opposition to discrimination, or participation in the discrimination-complaint process is unlawful and will not be tolerated" [see Exhibits 9 and 10], this would tend to show a pattern of willfully flaunting public

22

laws and policies in knowing and malicious retaliation to deter the disclosure of wrong doing.

26.     Defendant knew, or reasonably should have known, that making these false, defamatory, libelous and slanderous statements would be reported in writing to the National Practitioner's Data Bank and could, therefore, cause another employee to have legal action commenced against that person for libelously publishing this to any prospective employer of the Plaintiff and giving a false and misleading impression of Plaintiff's qualifications.  This libelous publication to the National Practitioner's Data Bank did, in fact, occur on or about June 27, 2012 in reckless disregard for the truth, the laws, public policies, and regulations and in retaliation prohibited by both public laws and public policies.  Defendant did this to harass, intimidate and to willfully interfere with multiple known business opportunities of the Plaintiff and for no other legitimate reason.  Defendant had a duty to make a reasonable, prudent investigation because Plaintiff had on December 23, 2011 filed an EEO Complaint for harassment, hostile work environment, and retaliation, among other things. This has become a formal EEO Complaint and Defendant knew or reasonably should have known this, most especially with the attorney having knowledge of this EEO Complaint was sitting at the table with him. Defendant knew or reasonably should have known that his actions were in violation of stated public policies and laws and the published policies of the Department of Veterans Affairs. Further, the Defendant knew or reasonably should have known that an Office of Special Counsel Complaint of this matter could and has ensued under file No. MA-12-3507 as well as a USERRA Complaint  under file No. DP-12-3463. See Exhibit 2 attached hereto and incorporated herein. These actions are a direct and proximate result of Defendant's malicious and fraudulent acts. The attorney who should have had knowledge of this was sitting at Defendant's table with him. Once, again, all Defendant had to do was turn to the attorney sitting at the table with him. In the preamble

23

to the attorney's code of professional ethics, all attorneys are advised to avoid even the appearance of impropriety.  The Defendant could have been advised of any public laws, policies, agreements, or other matters of which he might have question, particularly the published policies of the Department of Veterans Affairs regarding reprisal and retaliation being unlawful.  Moreover, all the Defendant had to do was listen to one of the most noted authorities on civil rights law in the State of Arkansas, John Wesley Hall, but Defendant in his refusal to abide by the published policies of the Department of Veterans Affairs failed and refused to do so.

27.    Had Defendant made the most cursory investigation, he would have known of the published policies of the Department of Veterans Affairs and stayed his actions.  Defendant continues to flaunt the published policies of the Department of Veterans Affairs as well as public laws and the Master Agreement and has taken no action to ameliorate his willful harm.  But, of course, the Plaintiff is a Viet Nam Era Veteran and this is indicative of the way many of Viet Nam era veterans have been horribly mistreated.

28.    Plaintiff reserves the right to further amend his pleadings.

RELIEF REQUESTED

29.    Plaintiff is seeking an immediate injunction prohibiting Defendant, or any person acting for or on his behalf, from making any further false, defamatory, libelous, slanderous, harassing, statements and/or acts and/or intimidating by false, defamatory, libelous, slanderous and/or misleading statements in any manner with Plaintiff's business opportunities, with Plaintiff's medical license, with the Plaintiff's legitimate, legal and ethical pursuits.  Plaintiff is asking for five (5) million dollars for Defendant's acts in pari delicto.  Plaintiff is asking for Three and one-half (3-1/2) million dollars in compensatory damages for lost business opportunities; Plaintiff is asking for Four

24

and one-quarter (4-1/4) million dollars for both past and current medical expenses, and an amount in punitive damages sufficient to deter the Defendant and all others similarly situated from any such further action.

## PRAYER

WHEREFORE, the Plaintiff Dr. Midyett requests an immediate injunction due to irreparable harm, for entry of judgment against the Defendant in the sum of Five (5) million dollars for Defendant's acts in pari delicto, Three and one-half (3-1/2) million dollars in compensatory damages for lost business opportunities, for Four and one-quarter (4-1/4) million dollars for both past and current medical expenses, for irreparable harm caused by false, defamatory and slanderous statements, and an amount in punitive damages sufficient to deter the Defendant and all others similarly situated from any such further action, for costs herein expended, for reasonable attorneys fees, and for all other proper relief to which he may show himself to be justly entitled, whether at law or in equity.

Respectfully submitted,

F. Allan Midyett, M.D.

By: _____

Carole D. Sexton (ABN 92053)
4678 Clear Creek Blvd.
Fayetteville, AR 72704
479-462-5136

25

EXHIBIT 1

| VA Department of Veterans Affairs | COMPLAINT OF EMPLOYMENT DISCRIMINATION | | |
|---|---|---|---|

| 1 NAME (Last, first, middle initial) (Please print) | 2. MAILING ADDRESS | 3a. WORK TELEPHONE NUMBER (Include Area Code) |
|---|---|---|
| MIDYETT, F. ALLAN | ▓▓▓▓▓▓▓ JAYETTEVILLE AR ▓▓▓▓ | 3b. HOME TELEPHONE NUMBER (Include Area Code) 479- ▓▓▓ |

| 4. ARE YOU: | 5a. JOB TITLE, SERIES AND GRADE | 6. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED |
|---|---|---|
| ☒ A VA EMPLOYEE | RADIOLOGIST, VM 602 | VA of the Ozarks 1100 College Avenue JAYETTEVILLE AR |
| ☐ AN APPLICANT FOR EMPLOYMENT | 5b SERVICE/SECTION/PRODUCT LINE | |
| ☐ A FORMER VA EMPLOYEE | RADIOLOGY | |

**INSTRUCTIONS:** For each employment related matter that you believe was discriminatory you must list the bases (list one or more of the following): Race (Specify), Color (Specify), Religion (Specify), Sex (Male or Female), Sexual Orientation, National Origin (Specify), Age (Provide date of birth), Disability (Specify), and Reprisal for prior EEO activity or having opposed discrimination.

| 7. BASIS | 8. CLAIM(S) (What employment related claim(s) - personnel action(s), incident(s), or event(s), caused you to file this complaint? Briefly, describe what happened below. Use an additional sheet of paper if necessary.) | 9. DATE OF OCCURRENCE (Include the most recent date(s)) |
|---|---|---|
| Disability, Failure to provide Reasonable accommodation harrassment hostile work Environment age, sex retaliation | On or about April 21, 2011 Retaliation from for reporting missed errors began - see attached statement | January 2011 thru 3-21-2012 |

| 10. REMEDIES |
|---|
| compensation from lost wages, lost job opportunities, lost income due to discrimination and retaliation + compensation for adversely impacted health |

| 11a. DO YOU HAVE A REPRESENTATIVE? | 11b. IF "YES," IS HE OR SHE AN ATTORNEY? | 11c. PROVIDE THE NAME, ADDRESS, AND TELEPHONE NUMBER OF YOUR REPRESENTATIVE |
|---|---|---|
| ☒ YES  ☐ NO | ☒ YES  ☐ NO | John Wesley Hall 1202 Main Street, Ste 210 Little Rock AR 72201 391 9131 501 |

| 12a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 12b. NAME OF EEO COUNSELOR | 12c. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| ☒ YES  ☐ NO | Kevin Broussard Shirley Thurston | 12-23-11 |

13. *NOTE:* If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, listed in item 9, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint, you must explain why you were untimely in seeking EEO counseling or untimely in filing a complaint. (If more space is needed, use an additional sheet of paper.)

| 14a. HAVE YOU FILED A UNION GRIEVANCE ON ANY CLAIM(S) LISTED ABOVE? | 14b. IF "YES," LIST THE CLAIM(S) AND DATE GRIEVANCE FILED | 15a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE CLAIMS LISTED ABOVE? | 15b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED. |
|---|---|---|---|
| ☒ YES  ☐ NO | 12-23-11 | ☐ YES  ☒ NO | |

| 16a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 16b. IF "YES," PROVIDE THE NAME AND ADDRESS |
|---|---|
| ☐ YES  ☒ NO | |

| 17 SIGNATURE OF COMPLAINANT (Do not print) | 18 DATE |
|---|---|
| F. Allan Midyett | 21 March 2012 |

VA FORM
NOV 2009 R.   **4939**



# Office of Resolution Management
*Department of Veterans Affairs*

## NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT
### Aggrieved Name: Dr. F. Allen Midyett
### Case No.: 2003-0564-2012101104

1. If you and your client are not satisfied with the results of the EEO counseling and believe that your client has been subjected to discrimination because of race, color, religion, sex (sexual harassment or gender), national origin, age, disability or reprisal for prior EEO activities, your client has the right to file a formal complaint of discrimination. **If your client decides to file a formal complaint, s/he must do so WITHIN FIFTEEN CALENDAR DAYS OF RECEIPT OF THIS NOTICE.**

2. Attached is VA Form 4939, Complaint of Employment Discrimination. If your client chooses to file a formal complaint at this time, use this form, and carefully read the instructions on the reverse side before completing it. I am available to assist you and your client in filling out this form and to answer any questions you may have about it. If you require assistance, please contact me immediately. **Please note that the 15-calendar day time frame will not be extended due to your client's need to seek my assistance in completing this form.**

3. Your client may file a complaint in person or by mail with the Regional EEO Officer. Your client may also file it with the Secretary of Veterans Affairs or with the Deputy Assistant *Secretary for Office of Resolution Management (DAS/ORM)*. Their addresses are listed below:

**Regional EEO Officer**
**Department of Veterans Affairs**
**Office of Resolution Management 08N**
**2002 Holcombe Boulevard**
**Building 110**
**Houston, TX 77030**

**Secretary of Veterans Affairs**
**Department of Veterans Affairs**
**810 Vermont Avenue, NW**
**Washington, D.C.  20420**

**Deputy Assistant Secretary (08)**
**Office of Resolution Management (ORM)**
**810 Vermont Avenue, NW**
**Washington, D.C. 20420**

If your client files a complaint with the Secretary or the DAS/ORM, your client must also provide a copy to this ORM Field Office. Failure to provide a copy to this ORM Field Office will only delay the processing of your client's complaint.

Page 2
Notice of Right to File Discrimination Complaint
Name of Aggrieved: Dr. F. Allen Midyett
Case Number: 2003-0564-2012101104

4.  You and your client must identify each event your client is protesting and provide the date on which each event occurred.  Your client's complaint must be specific and limited to the events your client discussed with me.  Therefore, if there are any events that your client has not discussed with me, s/he must do so immediately. Regulations require that your client provide the Department with an opportunity to resolve each event informally at EEO counseling.

5.  Your client is entitled to representation at every stage of the complaint process. Your client may choose anyone as a representative, unless the person occupies a position within VA that would create a conflict of interest.  If your client does select a representative, your client must inform this ORM Field Office, in writing, of the representative's name, telephone number, and business address.

6.  If your client is a member of the bargaining unit, s/he may have the right to dispute the events discussed with me through the union grievance procedure.  Regulations provide that your client may file either a grievance or an EEO complaint about the events in dispute, but not both.  Should your client file both, whichever your client files first (a union grievance or an EEO complaint) will be considered an election to proceed in that forum.

7.  If your client is complaining about a matter that may be appealed to the Merit Systems Protection Board (MSPB), your client may file an EEO complaint or an MSPB appeal, but not both.  Whichever your client files first (a formal EEO complaint or an MSPB appeal) will be considered an election to proceed in that forum.  If I can be of further assistance to you and your client, please advise.


_____          _____
Dr. F. Allen Midyett                      Date  -21-2012

_____          _____
Mr. John Wesley Hall                      Date  3.21-12


2003-0564-2012101104
Case Number

**EXHIBIT 2**

June 17, 2012

Complaints Examining Unit
Office of Special Counsel
1730 M Street, N.W., Suite 218
Washington, DC 20036-4505

      RE:    Complaint for Whistleblower violations and
              Prohibited Personnel Practices with a copy
              of the USERRA Complaint attached

Dear Ladies and Gentlemen:

Please find attached my Complaint for violations of the following:

1. **Article 15 of the Master Agreement** Between the Department of Veterans Affairs and the American Federation of Government Employees for 2011

2. The **Whistleblower Protection Act (5 U.S.C. § 2302 (b) (8)**

3. The **No FEAR Act of 2002 - Public Law 107-174**

4. **5 USC  Section 2302 and 2301**

5. **VHA Handbooks 1100.17 and 1100.19**

It is my understanding that you will not take mere hearsay allegations and that you require substantive proof.  I have tried to supply that.  I have a lengthy documented complaint with 26 Exhibits including audio recordings so that you may hear one of the parties of whom I am complaining in her own words.  I have also enclosed an official transcript to support my allegations.

I am asking for an immediate stay to stop all adverse actions and harassment.  I have supplied the proof of my having taken actions in reliance on  the No Fear Policy of the Department of Veterans Affairs, the No Fear Act of 2002, and the Whistleblower Protection Act.

On the day I discovered a radiology miss and it was reported, I was threatened with a loss of both my job and my medical license.  That radiology miss had gone unreported 9 times for 7 years until I found it.  That is simply one example.  My complaint is filled with them.

Thank you for your kind attention in this matter.

Yours truly,

From: Electronic 1010 Submission <userra@osc.gov>
To: F Allan Midyett <amidyett2@yahoo.com>
Cc: U.S. Office of Special Counsel <userra@osc.gov>
Sent: Monday, June 18, 2012 9:27 AM
Subject: USERRA Claim Receipt Timestamp: 06/17/2012 10:27:17 AM ET -- F Allan Midyett
Case Number: 05-AR-2012-01001-30-V

Dear F Allan Midyett,

At the time shown in this email's subject line, the Veterans' Employment and Training Service (VETS), U.S. Department of Labor received an electronic (USERRA) Form 1010 claim from you.

In accordance with the Veterans Benefits Improvement Act of 2010, VETS is assigning your claim to the U.S. Office of Special Counsel (OSC) for further action.  OSC will contact you about your claim.  If you do not hear from an OSC representative, you are encouraged to contact the OSC office shown below.  Please be prepared to provide this email's subject line when contacting OSC:

OSC Office Address:
Patrick H. Boulay, USERRA Coordinator
U.S. Office of Special Counsel
USERRA(Unit)
1730 M Street, N.W.
Suite(218)
Washington, D.C. 20036-4505

OSC Phone Number: (202) 254-3600
OSC Email Address: userra@osc.gov

*This message has been sent to verify receipt of your claim. It has been generated automatically by our electronic claim system (which cannot process incoming email), so please do not "reply" to the email address this message came "from." Instead, email can be addressed to the OSC Email Address shown above.*

Thank you,
VETS 1010 Web Team

U.S. OFFICE OF SPECIAL COUNSEL                           (202) 254-3600 / (202) 254-3670 / (800) 872-9855

## COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE
### OR
### OTHER PROHIBITED ACTIVITY

*(Please print legibly or type and complete all pertinent items.  Enter "N/A" (Not Applicable) or "Unknown" where appropriate.  (If more space is needed, use Continuation Sheet at page 12.)*

**PART 1:  PROHIBITED PERSONNEL PRACTICES / OTHER PROHIBITED ACTIVITY (GENERAL)**

1. Name of person seeking OSC action ("Complainant"):    Mr. (●)   Ms. (○)   Mrs. (○)   Miss (○)

   F Allan Midyett, M.D.

   For USERRA complaints only – please provide the last digit only of your Social Security Number (SSN): 5
   (needed to determine jurisdiction under § 204(c)(2) of Public Law No. 108-454.)

2. Position, title, series, and grade:
   Neuroradiologist   VM-15-1

3. Agency name: Department of Veterans Affairs

4. Agency address: 1100 North College Avene
   Fayetteville AR 72703-6995

5. Home or mailing address: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
   Fayetteville AR ▮▮▮▮▮▮▮

6. Contact information:          Telephone number(s):   623 4▮▮▮▮▮▮ (Home)
                                                        (    ) _____ (Office)  Ext. _____
                                Fax number:            (479) 3▮▮▮▮▮
                                E-mail address:        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7. If you are filing this complaint as a legal or other representative  of the Complainant, please supply the following information:

   Name and title of filer:          Mr. (○)   Ms. (○)   Mrs. (○)   Miss (○)

   _____

   Address:_____

   _____

   Telephone number(s):   (    ) _____ (home)
                          (    ) _____ (office)  Ext. _____
   Fax number:            (    ) _____
   E-mail address:        _____

8. Are you (or is the Complainant, if you are filing as a representative) covered by a collective bargaining agreementC (Check one)
                    (X) Yes              (  ) No          (  ) I don't know

9. How did you first become aware that you could file a complaint with OSC?

   (  ) OSC Web site       (  ) OSC speaker        (  ) OSC brochure        (  ) OSC poster
            (  ) news story            (  ) agency personnel office        (  ) union        (  ) co-worker
   (X) other (*please describe*):  An interested person at the VA
                        Date (*approximate*):  6-1-2012

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 2 of 12

10.  What is the employment status of the person affected by the suspected prohibited personnel practice or other prohibited activity?  (*Check all applicable items – more than one item may apply.*)

a.  ( )  Applicant for Federal employment

b.  (X)  Competitive Service
   ( ) temporary appointment          ( ) career or career-conditional appointment
   ( ) term appointment               (X) probationary employee

c.  (X)  Excepted Service
   ( ) Schedule A                     ( ) Postal Service
   ( ) Schedule B                     ( ) Tennessee Valley Authority
   ( ) Schedule C                     (X) VA Dept. of Medicine and Surgery
   ( ) National Guard Technician      (X) Veterans Readjustment Act (VRA)
   ( ) nonappropriated fund           ( ) other (*specify*): _____

d.  ( )  Senior Executive Service (SES), Supergrade, or Executive Level
   ( ) career SES                     ( ) Executive Level V or above (career) fund
   ( ) noncareer SES                  ( ) Executive Level V or above (noncareer)
   ( ) career GS-16, 17, or 18        ( ) Presidential appointee (Senate-confirmed)
   ( ) noncareer GS-16, 17, or 18

e.  ( )  Other
   ( ) civil service annuitant        ( ) military officer or enlisted person
   ( ) former civil service employee  ( ) contract employee
   ( ) competitive service            ( ) other (*specify*): _____
   ( ) excepted service               ( ) unknown

11.  What other action(s), if any, have you taken,   to appeal, grieve, or report this matter under any other procedure?  (*Check all that apply.*)

( )  None, or not applicable                                          Date: _____
( )  Appeal filed with Merit Systems Protection Board (MSPB)          Date: _____
( )  Petition for reconsideration of Initial decision filed with MSPB Date: _____
         Initial Decision No. _____
( )  USERRA claim filed with VETS (Department of Labor)               Date: _____
         (Form VETS/USERRA/VP-1010)
( )  Grievance filed under agency grievance procedure                 Date: _____
( )  Grievance filed under negotiated grievance procedure             Date: _____
( )  Matter heard by arbitrator under grievance procedure             Date: _____
( )  *Matter is pending in arbitration*                               Date: _____
( )  Discrimination complaint filed with agency                       Date: _____
( )  Agency or Administrative Judge (AJ) decision on discrimination
         complaint appealed to Equal Employment Opportunity Commission Date: _____
( )  Appeal filed with Office of Personnel Management                 Date: _____
( )  Unfair labor practice (ULP) complaint filed with
         Federal Labor Relations Authority General Counsel            Date: _____
( )  Lawsuit filed in Federal Court                                   Date: _____
         Court name: _____
( )  Reported matter to agency Inspector General                      Date: _____
( )  Reported matter to member of Congress                            Date: _____
         Name of Senator or Representative: _____
(X)  Other (*specify*): BOTH A GRIEVANCE AND AN EEO FORMAL
     COMPLAINT HAVE BEEN FILED BUT NOT REGARDING
     THIS MATTER

( ☐ ) Petition for reconsideration of initial decision filed with MSPB        Date: _____

         Initial Decision No. _____

( ☐ ) Grievance filed under agency grievance procedure        Date: _____

( ☐ ) Grievance filed under negotiated grievance procedure        Date: _____

( ☐ ) Matter heard by arbitrator under grievance procedure        Date: _____

( ☐ ) Matter is pending in arbitration        Date: _____

( ☐ ) Discrimination complaint filed with agency        Date: _____

( ☐ ) Agency or Administrative Judge (AJ) decision on discrimination complaint        Date: _____
         appealed to Equal Employment Opportunity Commission

( ☐ ) Appeal filed with the Office of Personnel Management        Date: _____

( ☐ ) Unfair Labor Practice (ULP) complaint filed with the        Date: _____
         Federal Labor Relations Authority General Counsel

( ☐ ) Lawsuit filed in Federal Court        Date: _____

         Court name: _____

( ☐ ) Reported matter to agency Inspector General        Date: _____

( ☐ ) Reported matter to Member of Congress        Date: _____

         Name of Senator or Representative: _____

( ☑ ) Other (*specify*): Grievance:EEO Complaint but not regarding this matter

---

## COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 3 of 12

12. What official is responsible for the violation(s) that you are reporting, and what is his/her employment status?  (*See question 10 for appropriate description of employment status. If space is needed to identify more than one official, use Continuation Sheet at page 12.*)

Name: Kathryn Witztum

Position/Title: Chief of Radiology

Employment Status: Employed

13. What are the actions or events that you are reporting to OSC? (*To the extent known, specifically list: (a) any suspected prohibited personnel practices or other prohibited activity, <u>other than reprisal for whistleblowing</u>; and (b) any personnel actions involved. (<u>IF YOU ARE ALLEGING REPRISAL FOR WHISTLEBLOWING, SKIP TO PART 2 ON THE NEXT PAGE.</u>)*)

```
Violation of Article 15 of the Master Agreement Between the Department of
Veterans Affairs and the American Federation of Government Employees for 2011
and
Violation of 5 USC  Section 2302 and 2301
and
Violation of VHA Handbooks 1100.17 and 1100.19
and
Violation of No FEAR Act of 2002 - Public Law 107-174 and
Violation of Whisteblower Protection Act (5 U.S.C. § 2302 (b) 8)
```

14. Provide details of the actions or events shown in your response to question 13. *(Be as specific as possible about dates, locations, and the identities and positions of all persons mentioned. In particular, identify actual and potential witnesses, giving work locations and telephone numbers when possible. Also, attach any pertinent documents that you may have. Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your request for OSC action. If more space is needed, continue on page 12.)*

```
SEE ATTACHED TYPEWRITTEN STATEMENT WITH 26 EXHIBITS
```

15. What action would you like OSC to take in this matter (that is, what remedy are you asking for?)

```
An immediate stay of all adverse proceedings against me.  For a stay to stop
the continuing harassment.  For the immediate reinstatement of all my federal
employment benefits and privileges and for compensatory and consequential
damages and legal fees.  Iam asking for an immediate investigation.
```

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**

Page 4 of 12

---

## PART 2: REPRISAL FOR WHISTLEBLOWING

*This part of the form is solely for use by persons alleging reprisal for whistleblowing (that is, persons who believe that personnel actions were taken, not taken, or threatened because of a whistleblower disclosure). Please read the introductory material before answering the questions that follow. Use the continuation sheet on page 12 if more space is needed.*

*Complainants **not** alleging reprisal for whistleblowing should proceed to Part 3 ("Consent to Certain Disclosures of Information"), at page 9.*

### Reprisal for Whistleblowing Allegations

As a general rule, it is a prohibited personnel practice to take or fail to take, or threaten to take or fail to take, a personnel action because of a protected disclosure of certain types of information by a Federal employee, former employee, or applicant for Federal employment. 5 U.S.C. § 2302(b)(8).

### Legal Elements of a Violation

By law, certain elements must be present before OSC can establish that a legal violation of law has occurred. Two of the required elements that must be established are: (1) that a whistleblower disclosure was made; and (2) that an agency took, failed to take, or threatened to take or fail to take a personnel action because of the whistleblower disclosure. Your description of these elements will help OSC's investigation of your allegation(s).

## Protected Disclosures

A disclosure of information is a protected whistleblower disclosure if a Federal employee, former employee, or applicant for Federal employment discloses information which he or she reasonably believes evidences: (a) a violation of any law, rule, or regulation; (b) gross mismanagement; (c) a gross waste of funds; (d) abuse of authority; or (e) a substantial and specific danger to public health or safety.

## Covered Personnel Actions

The law prohibiting reprisal for whistleblowing requires proof that one or more of the following personnel actions occurred, or failed to occur, because of a protected disclosure:

COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 5 of 12

(1) an appointment;

(2) a promotion;

(3) an action under 5 U.S.C. chapter 75 or other disciplinary or corrective action;

(4) a detail, transfer, or reassignment;

(5) a reinstatement;

(6) a restoration;

(7) a reemployment;

(8) a decision about pay, benefits, or awards, concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in 5 U.S.C. § 2302(a)(2);

(9) a performance evaluation under 5 U.S.C. chapter 43;

(10) a decision to order psychiatric testing or examination; or

(11) any other significant change in duties, responsibilities , or working conditions.

## Reporting Your Allegation(s)

In the section that starts below (pages 6-8), provide the information requested about all disclosures that you believe led to reprisal by the agency involved. If more space is needed, use extra copies of page 6-8, or the Continuation Sheet at page 12. **If any of the disclosures were in writing, please provide a copy of the disclosure with your complaint.**

**IT IS IMPORTANT THAT YOU LIST ALL DISCLOSURES AND PERSONNEL ACTIONS INVOLVED IN YOUR COMPLAINT.** This is because: (1) failure to list any disclosure or personnel action may delay the processing of your complaint by OSC; and (2) a comprehensive listing will avoid disputes in any later Individual Right of Action (IRA) appeal that you may file with the Merit Systems Protection Board (MSPB) about its jurisdiction to hear case.

Additional allegations of reprisal for whistleblowing may be added to this complaint while it is pending at OSC. Submission of any such additional allegations to OSC in writing will help you if you decide to file any later IRA appeal with the MSPB. Form OSC-11a is available for that purpose at OSC's web site, under "Forms."

## Appeal to the Merit Systems Protection Board (MSPB)

If OSC fails to complete its review of your whistleblower reprisal allegation within 120 days after it receives your complaint, or if it closes your complaint at any time without seeking corrective action on your behalf, you have the right to file IRA appeal with the MSPB. 5 U.S.C. § 1214.6(a)(3).

## Recordkeeping

To establish its jurisdiction over any later IRA appeal that you may file, the MSPB will require you to show that the appeal relates to the same whistleblower disclosure(s) and personnel action(s) involved in your complaint to OSC.  A copy of the

/12                Form OSC-11: Complaint of Prohibited Personnel Practice / Other Prohibited Activity

~~relates to the same whistleblower disclosure(s) and personnel action(s) involved in your complaint to OSC.   A copy of the~~ whistleblower reprisal allegations in your complaint, any supporting documentation about those allegations that you sent with the complaint, and any additional allegation of reprisal that you submitted in writing to OSC while the complaint was pending, will serve as proof in any IRA of the disclosure(s) and personnel action(s) involved in your OSC complaint. **IT IS IMPORTANT, THEREFORE, THAT YOU MAKE AND KEEP COPIES OF ALL THESE DOCUMENT FOR YOUR RECORDS.**

## COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 8 of 12

| **MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT** |
|---|

| **A.  WHAT INFORMATION WAS DISCLOSED?** *(DESCRIBE WHISTLEBLOWER DISCLOSURE.)* | |
|---|---|
| | **1. WHEN WAS THE DISCLOSURE MADE?** (MO/DA/YR)<br><br>04/21/2011 |
| | **2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**<br><br>Gary Eagle, RT, and Kathryn Witztum, Chief |
| | **3. DISCLOSURE OF INFORMATION EVIDENCED** *(check all that apply):*<br><br>( ☐ )  VIOLATION OF LAW, RULE, OR REGULATION<br>( ☑ )  GROSS MISMANAGEMENT<br>( ☑ )  GROSS WASTE OF FUNDS<br>( ☑ )  ABUSE OF AUTHORITY<br>( ☑ )  SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC<br> HEALTH OR SAFETY<br>( ☐ )  NONE OF THE ABOVE |
| I compiled a list of radiology misses.  I thought this could be a learning experience and no individual radiologist would be named. I thought this would benefit all the department. | **4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?**<br><br>They made me erase the documentation |
| | **5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?** (MO/DA/YR)<br><br>04/28/11 |

17/12           Form OSC-11: Complaint of Prohibited Personnel Practice / Other Prohibited Activity

relates to the same whistleblower disclosure(s) and personnel action(s) involved in your complaint to OSC. A copy of the whistleblower reprisal allegations in your complaint, any supporting documentation about those allegations that you sent with the complaint, and any additional allegation of reprisal that you submitted in writing to OSC while the complaint was pending, will serve as proof in any IRA of the disclosure(s) and personnel action(s) involved in your OSC complaint. IT IS IMPORTANT, THEREFORE, THAT YOU MAKE AND KEEP COPIES OF ALL THESE DOCUMENT FOR YOUR RECORDS.

## COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 6 of 12

### MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT

**A. WHAT INFORMATION WAS DISCLOSED?**
*(DESCRIBE WHISTLEBLOWER DISCLOSURE.)*

I found a radiology miss, a large bulla, that had gone undetected by a number of other radiologists and casually commented to the radiologist sitting next to me about this. This miss had gone undetected 9 times over 7 years. I just thought it was interesting that it had been missed so many times.

**1. WHEN WAS THE DISCLOSURE MADE? (MO/DA/YR)**

10/20/11

**2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?**

Kerry Berthold

**3. DISCLOSURE OF INFORMATION EVIDENCED (*check all that apply*):**

( ☐ )   VIOLATION OF LAW, RULE, OR REGULATION
( ☑ )   GROSS MISMANAGEMENT
( ☑ )   GROSS WASTE OF FUNDS
( ☑ )   ABUSE OF AUTHORITY
( ☑ )   SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC
          HEALTH OR SAFETY
( ☐ )   NONE OF THE ABOVE

**4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?**

Threatened my job & medical license

**5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR? (MO/DA/YR)**

10/20/11 and 11/17/11

5/12

Form OSC-11: Complaint of Prohibited Personnel Practice / Other Prohibited Activity

---

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

---

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 7 of 12

---

**MUST BE COMPLETED FOR ALL DISCLOSURES REPORTED IN THIS COMPLAINT**

---

| C. WHAT INFORMATION WAS DISCLOSED? *(DESCRIBE NEXT WHISTLEBLOWER DISCLOSURE.)* | |
|---|---|
| | **1. WHEN WAS THE DISCLOSURE MADE?** (MO/DA/YR) 12/19/2011 |
| | **2. TO WHOM (NAME AND TITLE) WAS THE DISCLOSURE MADE?** John Henley, Chief of Staff |
| I handed a second *list of 116 radiology misses* to Chief of Staff John Henley.  This list, second list, ranged from intracranial arteriovenous malformations to cancer to other things. | **3. DISCLOSURE OF INFORMATION EVIDENCED** *(check all that apply)*: <br><br> ( ☐ )  VIOLATION OF LAW, RULE, OR REGULATION <br> ( ☑ )  GROSS MISMANAGEMENT <br> ( ☑ )  GROSS WASTE OF FUNDS <br> ( ☑ )  *ABUSE OF AUTHORITY* <br> ( ☑ )  SUBSTANTIAL AND SPECIFIC DANGER TO PUBLIC HEALTH OR SAFETY <br> ( ☐ )  NONE OF THE ABOVE |
| | **4. WHAT PERSONNEL ACTION(S) OCCURRED, FAILED TO OCCUR, OR WAS THREATENED BECAUSE OF THE DISCLOSURE?** Termination & threatened my medical license |
| | **5. WHEN DID PERSONNEL ACTION(S) OR THREAT(S) OCCUR?** (MO/DA/YR) Immediately and 01/20/12 |

Form OSC-11: Complaint of Prohibited Personnel Practice / Other Prohibited Activity

*KEEP A COPY OF THIS PAGE FOR YOUR RECORDS*

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 8 of 12

---

**MUST BE COMPLETED FOR ALL DISCLOSURES INCLUDED IN THIS COMPLAINT**

3. If you are not the person who actually made a disclosure described in boxes A, B, C, D above, please check below to specify the disclosure involved, and provide the name, address, and telephone number of the person who made the disclosure, if known. (*If space is needed to identify more than one person, use Continuation Sheet at page 12.*)

Disclosure:     A ( ☐ )        B ( ☐ )        C ( ☐ )        D ( ☐ )

Name:

Address:

Telephone number:     ( ____ )                    Ext.

4. Explain why you believe that the personnel action(s) listed above occurred because of the disclosure(s) that you described. (*Be as specific as possible about any dates, locations, names, and positions of all persons mentioned in your explanation. In particular, identify actual and potential witnesses, giving work locations and telephone numbers, if known. Attach a copy of any documents that support your statements. Please provide, if possible, a copy of the notification of the agency's proposal and/or decision about the personnel action(s) covered by your complaint. If more space is needed, continue on page 12.*)

> I believe that all personnel actions were reprisals for having found radiology misses. Nothing negative was said to me until I revealed the first list of misses. Many such institutions have a regularly scheduled meeting to discuss misses so that all radiologists may learn from each other. I was accustomed to this. I never thought the VA of the Ozarks would be so afraid of having their misses revealed. It is to everyone's benefit to learn. The eye cannot see what the mind does not know is a maxim of radiology. I even suggested a regular teaching meeting with all radiologists. Each radiologist could take turns or I would have done all the work. Kathryn Witztum absolutely refused. After this, Kathryn Witztum began to say I was not hired as a neuroradiologist and she began to adamantly refuse to allow me to practice in my subspecialty. I am still listed on their website as a neuroradiologist. I have attached a typewritten statement with 26 Exhibits, one of which is an audio recording of Kathryn Witztum repeatedly refusing to allow me to practice in my subspecialty.

5. What action would you like OSC to take in this matter (that is, what remedy are you asking for)?

**KEEP A COPY OF THIS PAGE FOR YOUR RECORDS**

---

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 9 of 12

---

## PART 3: CONSENT TO CERTAIN DISCLOSURES OF INFORMATION

OSC asks everyone who files a complaint alleging a possible prohibited personnel practice or other prohibited activity to select one of three Consent Statements shown below. **IF YOU DO NOT SELECT ONE OF THE THREE CONSENT STATEMENTS BELOW, OSC WILL ASSUME THAT YOU HAVE SELECTED CONSENT STATEMENT 1.** Please: (a) select and sign (or check, if filing electronically) one of the Consent Statements below; and (b) keep a copy of the Consent Statement you select (as well as a copy of all documents that you send to OSC) for your own records.

*If you initially select a Consent Statement that restricts OSC's use of information, you may later select a less restrictive Consent Statement. If your selection of Consent Statement 2 or 3 prevents OSC from being able to conduct an investigation, an OSC representative will contact you, explain the circumstances, and provide you with an opportunity to select a less restrictive Consent Statement.*

You should be aware that the Privacy Act allows information in OSC case files to be used or disclosed for certain purposes, regardless of which Consent Statement you sign. See 5 U.S.C. § 552a(b). Information about certain circumstances under which OSC can use or disclose information under the Privacy Act appears on the next page.

***(Please sign one)***

---

**Consent Statement 1**

I *consent* to OSC's communication with the agency involved in my complaint. I agree to allow OSC to disclose my identity as the complainant, and information from or about me, to the agency if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through mediation or corrective action). I understand that regardless of the Consent Statement I choose, OSC may *disclose* information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

_____     __6 - 16 - 2012__
Complainant's Signature for Consent Statement 1          Date Signed

**Consent Statement 2**

I *consent* to OSC's communication with the agency involved in my complaint, but I do not agree to allow OSC to disclose my identity as the complainant to that agency. I agree to allow OSC to disclose only information from or about me, without disclosing my name or other identifying information, if OSC decides that such disclosure is needed to investigate the allegation(s) in my complaint (for example, to request information from the agency, or seek a possible resolution through

Form OSC-11: Complaint of Prohibited Personnel Practice / Other Prohibited Activity

mediation or corrective action). I understand that in some circumstances (for example, if I am complaining about my failure to receive a promotion), OSC could not maintain my anonymity while communicating with the agency involved about a specific personnel action. In such cases, I understand that this request for confidentiality might prevent OSC from taking further action on my complaint. I also understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

_____          _____
Complainant's Signature for Consent Statement 2                Date Signed


### Consent Statement 3

I *do not consent* to OSC's communication with the agency involved in my complaint. I understand that if OSC decides that it cannot investigate the allegation(s) in my complaint without communicating with that agency, my lack of consent will probably prevent OSC from taking further action on the complaint. I understand that regardless of the Consent Statement I choose, OSC may disclose information from my complaint file when permitted by the Privacy Act (including circumstances summarized in Part 5, below).

_____          _____
Complainant's Signature for Consent Statement 3                Date Signed


## COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY
Page 10 of 12

---

### PART 4: CERTIFICATION AND SIGNATURE

*I certify that all of the statements made in this complaint (including any continuation pages) are true, complete, and correct to the best of my knowledge and belief. I understand that a false statement or concealment of a material fact is a criminal offense punishable by a fine of up to $250,000, imprisonment for up to five years, or both. 18 U.S.C. § 1001.*

_____          06-16-2012
Signature                                                         Date Signed


### PART 5: PRIVACY ACT / PAPERWORK REDUCTION ACT STATEMENTS

*Routine Uses.* Limited disclosure of information from OSC files is needed to fulfill OSC's investigative, prosecutorial, and related responsibilities. OSC has described 18 routine uses for information in its files in the *Federal Register* (F.R.), at 66 F.R. 36611 (July 12, 2001), and 66 F.R. 51095 (October 5, 2001). A copy of the routine uses is available from OSC upon request. A summary of the routine uses appears below.

OSC may disclose information from its files in the following circumstances:

1. to disclose that an allegation of prohibited personnel practices or other prohibited activity has been filed;

2. to disclose information to the Office of Personnel Management (OPM) as needed for inquiries involving civil service laws, rules or regulations, or to obtain an advisory opinion;

3. to disclose information about allegations or complaints of discrimination to entities concerned with enforcement of antidiscrimination laws;

4. to the MSPB or the President, when seeking disciplinary action;

5. to the involved agency, MSPB, OPM, or the President when OSC has reason to believe that a

prohibited personnel practice has occurred, exists, or is to be taken;

6. to disclose information to Congress in OSC's annual report;

7. to disclose information to third parties (without identifying the complainant unless OSC has the complainant's consent) as needed to conduct an investigation; obtain an agency investigation and report on information disclosed to OSC's whistleblower disclosure channel; or to give notice of the status or outcome of an investigation;

8. to disclose information as needed to obtain information about hiring or retention of an employee; issuance of a security clearance; conduct of a security or suitability investigation; award of a contract; or issuance of a license, grant, or other benefit;

---

**COMPLAINT OF POSSIBLE PROHIBITED PERSONNEL PRACTICE OR OTHER PROHIBITED ACTIVITY**
Page 11 of 12

---

9. to the Office of Management and Budget (OMB) for certain legislative coordination and clearance purposes;

10. to provide information from an individual's record to a congressional office acting pursuant to the individual's request;

11. to furnish information to the National Archives and Records Administration for records management purposes;

12. to produce summary statistics and work force or other studies;

13. to provide information to the Department of Justice as needed for certain litigation purposes;

14. to provide information to *courts or adjudicative bodies* as needed for certain litigation purposes;

15. to disclose information to the MSPB as needed in special studies authorized by law;

16. for coordination with an agency's Office of Inspector General or comparable entity, to facilitate the coordination and conduct of investigations and review of allegations;

17. to news media or the public in certain circumstances (except when the Special Counsel determines that disclosure in a particular case would be an unwarranted invasion of personal privacy); and

18. to the Department of Labor and others as needed to implement the Uniformed Services Employment and Reemployment Rights Act of 1994, and the Veterans' Employment Opportunities Act of 1998.

If OSC officials believe that disclosure may be appropriate in a situation not covered by one of OSC's routine uses, or one of the 11 other exceptions to the Privacy Act's general prohibition on disclosure, OSC will seek written authorization from the complainant permitting the disclosure.

*Purposes, Burdens, and Other Information.* An agency may not conduct or sponsor a collection of information, and persons may not be required to respond to a collection of information, unless it: (a) has been approved by OMB, and (b) displays a currently valid OMB control number. The information in this form is collected pursuant to OSC's legal responsibility to investigate: (a) allegations of prohibited personnel practices, to the extent necessary to determine whether there are *reasonable grounds* to believe that a prohibited personnel practice has occurred, exists, or is to be taken (5 U.S.C. § 1214); and (b) other allegations of prohibited activity (5 U.S.C. § 1216). The information will be reviewed by OSC to determine whether the facts establish its jurisdiction over the subject of the complaint, and whether further investigation and corrective or disciplinary action is warranted. The reporting burden for this collection of information is estimated to be an average of one hour and 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering the data needed, and completing and reviewing the form. Please send any comments about this burden estimate, and suggestions for reducing the burden, to the Office of Special Counsel, Legal Counsel and Policy Division, 1730 M Street, N.W. (Suite 218), Washington, DC 20036-4505. Use of this form to file a complaint alleging a prohibited personnel practice or other prohibited activity is required; use of this to file a complaint alleging only a Hatch Act violation is not required. 5 C.F.R. § 1800.1(d), as amended. As stated in Part 3 of this form, complainants may request that OSC maintain their name, and information provided by them, *in confidence*.

**EXHIBIT 3**

# the DataBank

P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

DCN: 5500000075823270
Process Date: 06/27/2012
Page: 1    of    3
MIDYETT, F. ALLAN
For authorized use by:
MIDYETT, F. ALLAN

# ADVERSE ACTION REPORT

## TITLE IV CLINICAL PRIVILEGES ACTION

### Report Number: 5500000075823270

### This report is maintained under the provisions of:

[X] **Title IV (NPDB)**          [ ] **Section 1921 (NPDB)**          [ ] **Section 1128E (HIPDB)**

The information contained in this report is maintained by the National Practitioner Data Bank for restricted use under the provisions of Title IV of Public Law 99-660, as amended as codified in 45 CFR Part 60. All information is confidential and may be used only for the purpose for which it was disclosed. Disclosure or use of confidential information for other purposes is a violation of Federal law. For additional information or clarification, contact the reporting entity identified in Section A.

**A. REPORTING ENTITY**

| | |
|---|---|
| Entity Name: | VETERANS HEALTHCARE SYSTEM OF THE OZARKS |
| Address: | 1100 NORTH COLLEGE AVENUE |
| City, State, Zip: | FAYETTEVILLE, AR 72703-6695 |
| Country: | |
| Name of Office: | LISA S DAHLGREN |
| Title or Department: | MEDICAL STAFF COORDINATOR |
| Telephone: | (479) 587-5901 |
| Entity Internal Report Reference: | |
| Type of Report: | INITIAL |

**B. SUBJECT IDENTIFICATION INFORMATION (INDIVIDUAL)**

| | |
|---|---|
| Subject Name: | MIDYETT, F. ALLAN |
| Other Name(s) Used: | |
| Gender: | MALE |
| Date of Birth: | 09/20/1941 |
| Organization Name: | VETERANS HEALTHCARE SYSTEM OF THE OZARKS |
| Work Address: | 1100 NORTH COLLEGE AVENUE |
| City, State, ZIP: | FAYETTEVILLE, AR 72703-6695 |
| Home Address: | |
| City, State, ZIP: | FAYETTEVILLE, |
| Deceased: | NO |
| Social Security Numbers (SSN): | ***-**-3175 |
| Professional School(s) & Year(s) of Graduation: | UNIVERSITY OF TENNESSEE COLLEGE OF MEDICINE (1965) |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | MD037826, DC |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | 4301093166, MI |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | C34924, CA |
| Occupation/Field of Licensure (Code): | PHYSICIAN (MD) |
| State License Number, State of Licensure: | 99-00103, NC |
| Drug Enforcement Administration (DEA) Numbers: | FM1163194 |
| Name(s) of Health Care Entity (Entities) With Which Subject Is Affiliated or Associated (Inclusion Does Not Imply Complicity in the Reported Action.): | |
| Business Address of Affiliate: | |
| City, State, ZIP: | |
| Nature of Relationship(s): | |

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

# the DataBank

P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

| DCN: 5500000075823270 |
| Process Date: 06/27/2012 |
| Page: 2    of    3 |
| MIDYETT, F. ALLAN |
| For authorized use by: |
| MIDYETT, F. ALLAN |

## C. INFORMATION REPORTED

| | |
|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES |
| Basis for Action: | SUBSTANDARD OR INADEQUATE CARE (F6) |
| | INCOMPETENCE (11) |
| Adverse Action Classification Code(s): | REVOCATION OF CLINICAL PRIVILEGES (1610) |
| | TERMINATION OF PANEL MEMBERSHIP OR EMPLOYMENT |
| | (PROFESSIONAL REVIEW ACTION) (1615) |
| Date Action Was Taken: | 04/06/2012 |
| Date Action Became Effective: | 04/06/2012 |
| Length of Action: | PERMANENT |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | DR. MIDYETT'S PROFESSIONAL BEHAVIOR AND PERFORMANCE AS A STAFF RADIOLOGIST DEMONSTRATED SUBSTANDARD CARE AND PROFESSIONAL INCOMPETENCE.  THE PROFESSIONAL STANDARDS BOARD REVIEWED ALL DOCUMENTATION AND FOUND; #1 REPETITIVE PATTERN OF UNSATISFACTORY DICTATION OF STUDIES; #2 PATTERN OR REQUEST FROM CLINICIANS FOR REINTERPRETATION OF STUDIES DICTATED BY DR. MIDYETT; #3 DICTATION REPEATEDLY LACKING CLINICAL INFORMATION AND NOT ADDRESSING CLINICAL QUESTIONS FROM WHICH STUDIES WERE ORDERED; #4 ABANDONMENT OF PATIENT DURING BARIUM ENEMA CONTRACT STUDY AND #5 CONSISTENT PATTERN OF NOT READING STAT EMERGENCY DEPARTMENT TESTS WITHIN THE PRESCRIBED 30 MINUTES. |

## D. SUBJECT STATEMENT

If the subject identified in Section B of this report has submitted a statement, it appears in this section.

Date Submitted:   07/03/2012

I dispute this report. This report was made in violation of (1) No FEAR Act of 2002 - Public Law 107-174); (2) Whistleblower Protection Act (5 U.S.C. Sec. 2302 (b) (8) and (3) VHA Handbooks 1100.17 and 1100.19. This is non-reportable.This report was made after I filed a Whistleblower Complaint listing more than 116 serious radiology misses - some misses repeated for 7 years. I had filed a complaint with the Office of Special Counsel regarding these violations prior to this reporting. It is OSC File No. MA-12-3507. The OSC issued a stay against this facility. I was hired as a neuroradiologist as is reflected on the website of VA of the Ozarks even after I left employment there. My work and performance are in compliance with ACR recommended standards as well as standards set by federal law. There is no credible evidence I abandoned any patient. All my reports show that my work is in accordance with ACR recommended standards and timely performed. There is no credible evidence I have not performed in my subspecialty. I fully performed according to ACR recommended standards. There is no written policy which I have violated. There is no credible evidence I did not timely perform work. I reported another physician for deviating from the ACR recommended standard and this is a reprisal. Additionally, I have filed a USERRA Complaint against VA of the Ozarks in that I was the only radiologist who was a veteran - a Viet Nam Era veteran. There has been no complaint made by any patient. I have previously filed an EEO Complaint against the person who perpetrated this report and it has become a formal complaint finding a hostile work environment. This report is in reprisal for that formal EEO Complaint in violation of the above cited laws and in reprisal for finding multiple serious radiology misses which extended over a period of years and have gone uncorrected. I have submitted extensive documentation to OSC which has come from VA of the Ozarks and which VA of the Ozarks refuses to acknowledge, including transcripts and audio recordings of when I was threatened as well as statements in contravention of the Master Agreement and federal law. Documentation supporting that I have complied with ACR recommended standards is in the hands of OSC. Documentation contravening the allegations made in this report

CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY

<span style="font-style:italic">the</span> **DataBank**

P.O. Box 10832
Chantilly, VA 20153-0832

http://www.npdb-hipdb.hrsa.gov

| | |
|---|---|
| DCN: 5500000075823270 | |
| Process Date: 06/27/2012 | |
| Page: 3    of    3 | |
| MIDYETT, F. ALLAN | |
| For authorized use by: | |
| MIDYETT, F. ALLAN | |

is in the hands of OSC. I have supplied the transcript wherein the Panel Chair refused to allow me to submit my answer to these allegations - he simply ignored VHA Handbook 1100.17 and the law. I have submitted documentation that any cases alleged to have not been done in a timely manner were, in fact, "nighthawk" cases or not timely delivered to me. I did not report for work before 8:00 a.m. and could not be accountable for cases performed before that time and certainly not cases performed before 7:00 a.m. Under the handbook at least one panel member has to be of my specialty; I am a neuroradiologist. There was no neuroradiologist, nor neurosurgeon, nor neurologist on the panel. I was the only neuroradiologist in residence at this facility and the only veteran who was a radiologist. It is a VA policy to hire and retain veterans. I have fully complied with the 2006 Tax Relief and Health Care Act which sets forth itemized reporting. This is the ACR recommended standard for reporting. The VA of the Ozarks has repeatedly violated Article 27 of the Master Agreement as well as Article 15 and various other provisions in regard to me. They have simply ignored rules, laws, etc. In the documentation submitted to the OSC is a written admission of this as well as an admission of violation of the ADEA. Lastly, even though I requested time off in writing for family medical reasons, I was not given any time off in violation of the Family Medical Leave Act. My mother died in my arms on August 30, 2011, I was expected to work that day. My wife had major surgery for ovarian cancer and chemotherapy, I had no time off to be with her. I was the only veteran there.

**E. REPORT STATUS**   Unless a box below is checked, the subject of this report identified in Section B has not contested this report.

[X]   If box is checked, this report has been disputed by the subject identified in Section B.

[ ]   If box is checked, at the request of the subject identified in Section B, this report is being reviewed by the Secretary of the U.S. Department of Health and Human Services to determine its accuracy and/or whether it complies with reporting requirements.  No decision has been reached.

[ ]   If box is checked, at the request of the subject identified in Section B, this report was reviewed by the Secretary of the U.S. Department of Health and Human Services. The Secretary's decision is shown below:

Date of Original Submission:        06/27/2012
Date of Most Recent Change:       06/27/2012

——————————— **END OF REPORT** ———————————

**CONFIDENTIAL DOCUMENT - FOR AUTHORIZED USE ONLY**

**EXHIBIT 4**

A Description of Chemotherapy by Diane Midyett

In Kathryn Whitztum's statement of January 20, 2012 she states Dr. Midyett was never denied time off for medical reasons. Yet we have provided to OSC her own emails wherein she does exactly that.

For those of you who may not be familiar with chemotherapy and its side effects, let me give you a very brief description:

I was given a sheaf of papers with very large letters in bold print saying FDA WARNING about how the treatment I was going to be given was toxic and how it could effect members of my household. Then both of my arms were warmed to make the veins more accessible and the multiple combinations of drugs were begun. Included in these drugs were drugs to try to prevent nausea and diarrhea as well as steroids to help counteract as many side effects as possible.

Within 4 to 5 hours of receiving the chemo drugs, I would begin to be sick. I would have diarrhea until I bled and it would not stop. I would vomit until my throat was so sore my voice changed. And nothing would stop it. If I swallowed anything at all, this would happen. Of course, by not swallowing anything, even water, I would dehydrate and then have to go back and the chemotherapy nurses would have to search for more veins to administer hydration fluids and more anti-nausea drugs.

My white count dropped so precipitously, I was given several drugs to boost the bone marrow production. I was told I could not be around any other people because I had no resistance to infection and it could be fatal. This forced my husband to be my only caregiver. At one point, I was told the only reason I was not being hospitalized was because I was married to and living with a doctor who would be able to recognize when I went into a coma.

And it is very true that the oncologists at Highland Oncology all told me how fortunate I am that my husband found the ovarian cancer at a stage that was as treatable as it is. Most ovarian tumors are not found until it is too late - that is why ovarian cancer is called the silent killer. I am alive right now because my husband is a very good physician and found my ovarian tumor when others admit they missed it. I well recall seeing his face pale as he read the pelvic CT. My oncologic surgeon, Dr. Hightower, could not look me in the face as he told me that I had ovarian cancer and how quickly I had to be in surgery. All I could think was: Gilda Radner had ovarian cancer and she died despite all her and her husband Gene Wilder's resources.

My husband worked the day I had surgery. So when Kathryn Whitztum says Dr. Midyett did not ask for and was not denied time off for medical reasons, we have supplied written proof this is simply not true.

The second time I was administered chemotherapy drugs, a lady came and sat beside me. She was very nervous and asked me about the treatment. She said this was her husband's first time. He was being administered the very drugs that were flowing into my arm. I assured her that because he was relatively young, under 60, he would do just fine. It was at this point he went into cardiac arrest.

Needless to say, he was not just fine. The oncology nurses did everything they could. They even called paramedics for emergency transport to Washington Regional. But he had cardiac arrest and he died. There was no more need for chemotherapy for him. I was not just fine. I was scared to death. The same drugs were flowing into my arm and I was all alone because my husband had to work in spite of the Family Medical Leave Act.

If you read Kathryn Whitztum's statement you can see the contempt in what she says about this. Every other woman has been very supportive. And so have most men.

Having cancer and having a relative with cancer are two entirely different things - like life and death.

I can tell you this because my mother had small cell carcinoma of the lung. But when I sat and had an oncologist look everywhere but at my face as he told me I had ovarian cancer, all I could think was: Gilda Radner had ovarian cancer and she died. Despite all her resources and the resources of her husband Gene Wilder, she died.

There is a world of difference between being with a loved one with cancer and having cancer and I can tell you this from very personal experience. I have had to hold my mother's hand when she understood that her cancer was fatal. The far harder experience was knowing that I would have to tell my children their mother had the silent killer. No parent should ever have to inflict that kind of emotional pain on her child. And Kathryn Witztum saw no reason why my husband needed time off. That is the kind of person she is and indicative of how she has handled this entire matter.

The only people who have failed to be understanding of cancer have been associated with V. A. of the Ozarks. Even complete strangers have been supportive, but not anyone from V.A. of the Ozarks. I have had doctors I have only just met leave waiting rooms full of patients to take time to help me and tell me it is because of this situation. But no one - not one single physician - from V. A. of the Ozarks has said one supportive thing. If you doubt this, read the transcript. I sent a copy of the transcript to the OSC because it shouts volumes about that facility and the people in it.

**EXHIBIT 5**

From: "Midyett, E. Allan (FAY)" <E.Allan.Midyett@va.gov>
To: "Witztum, Kathryn E. (FAY)" <Kathryn.Witztum@va.gov>
Cc: "Eagle, Gary M. (FAY)" <Gary.Eagle@va.gov>; amidyett2@yahoo.com
Sent: Tuesday, August 9, 2011 2:03 PM
Subject: Diane's One Week Checkup

She switched it to 0915 Thursday. Hope this works better.

Lan

From: Witztum, Kathryn E. (FAY)
Sent: Monday, August 08, 2011 11:51 PM
To: Midyett, E. Allan (FAY)
Subject: RE: Diane's One Week Checkup

Allan,

As you know, we are still down to 3 of 6 RADS here tomorrow…we really need you here working.  Any chance you can reschedule the appointment for Wed. PM, or Thurs. AM instead? Kerry will be back Wed., & MJ will be back Thurs.

The OIG inspectors are here all week, so I have more meetings than usual the first half of this week.  I have 3 biopsies Wed. AM, but no biopsies or major meetings on Thurs.  I am already doing all the MRI consult approvals, as well as all biopsy approvals, half the regularly scheduled CTs, & all the usual administrative stuff I need to do.

Steve Hamric normally does the MRI consult approvals, something I would appreciate your helping with, especially now we are short handed for MRI for 2 weeks.  This is done through CPRS, must be done for each case before it is scheduled, by decree from the front office.  We have arranged for Little Rock VA RADS to pick up the MSK MRIs after 4:30 daily while Hamric is away, to keep you from being overloaded.  The timing for this OIG inspection really is unfortunate, on top of people needing to be away.  So please try to help out by being here to work, especially these 1st 2 days.

Thank you.  KW

From: Midyett, E. Allan (FAY)
Sent: Monday, August 08, 2011 2:43 PM
To: Witztum, Kathryn E. (FAY); Eagle, Gary M. (FAY)
Cc: 'amidyett2@yahoo.com'
Subject: Diane's One Week Checkup

Diane received from her device 2 days later and is doing better at home, but has to go back for a 1 week checkup tomorrow @ 1:00 PM.  She is not yet allowed to drive, so I will need to take her. Hopefully coming back later tomorrow afternoon.

**EXHIBIT 6**

Retropharyngeal ICA, Throid mass,
two areas of encephalomalacia, one missed, other
called "edema" Needless F/U with contrast
in caudate head

| | | |
|---|---|---|
| S/P Lens Replacement Surgery | CTB | |
| pulmonary nodule "no evidence of a pulmonary nodule" | | 10/25/2010 |
| Bilat renal artery stenosis, Enlarged SV | CT | |
| Abnormal air shaddow, poss eso diverticulum | CXR | 8/6/2009 |
| Describes pituitary gland- looks like clivus  chordoma | MRB | 3/30/2011 |
| multiple osteocartilageous loose bodies | Knee | 9/30/2011 |
| False + "Focal soft tissue prominence anterior suprasellar cistern" | | 9/20/2011 |
| S/P LRS not mentioned | | |
| Ca++ mediastinal & hilar nodes | | 2/26/2010 |
| MNG thyroid enlargement | | 3/18/2010 |
| aortic valvular disease proven on echo | | 8/31/2011 |
| 1 x 1.5x 2 cm Gallstone | CXR | 4/28/2010 |
| " | | 6/28/2006 |
| One cm extruded disk fragment on left as well as central protrusion | | 10/30/2011 |
| Focal bony mass from hyperostosis interna with mass effect | | |
| He describes "lucency" in frontoparietal area. It is temporal and | | |
| is not real. The frontal mass is real and pushing on brain | | |
| PVWMC "a mass cannot be totally excluded" MRI Performed | CTB | |
| 15 mm pituitary cyst: "Empty sella vs PO | CTB | 11/1/2010 |
| " Empty sella vs PO" | MRB | 11/5/2008 |
| Fusion C7/T1 | | 10/4/2011 |
| | | 9/0/03 |
| | | 9/15/1993 |
| | | 6/22/1995 |
| Missing screws | CS | 12/15/2010 |
| "The screws at C5 have broken" | CS | 12/15/2010 |
| "there are broken screws at C5 levle;. Etc | CS | 10/17/2007 |
| Lung cysts/cavity 4.5 x 3.6 cm right: 2.2 x 3.3c m left | CXR | 3/31/2011 |
| | " | 10/20/2011 |
| | " | 8/3/2006 |
| | | 7/20/2010 |
| | | 9/1/2009 |
| | | 2/12/2009 |
| | | 5/2/2008 |
| | | 12/6/2007 |
| | | 8/17/2007 |
| | | 6/24/2002 |
| Aortic valvular disease proven on CT | CXR | 6/24/2010 |
| | | 6/23/2010 |
| Right thyroid mass on  CT | CTCS | 9/15/2011 |
| " | CXR | 11/9/2009 |
| " | CXR | 9/10/2009 |
| " | | 11/4/2009 |

| | | |
|---|---|---|
| AVM****** | CTB | |
| Gastric Carcinoma | | 9/19/2011 |
| Rectal CA | CT | |
| 13 cm bulla | CXR | |
| Two cm bulla left apex | CXR | |
| Pneumothorax | CXR | 10/5/2011 |
| Lung abscess."No content to suggest active infection or abscess" | | 9/14/2011 |
| 3 cm opaque bladder calculus | | 10/5/2010 |
| Gout | Hand | |
| ***** Fx Odontoid, Ca++ Carotids | CS | 7/12/2011 |
| AAA | US | 4/28/2011 |
| SDH Bilateral reported as unilateral**** | CTB | |
| 1 x 1.5 cm nasopharyngeal mass | | |
| Multiple mengioceles poss schwanoma | | |
| Esophageal Achylasia | CXR | 9/20/2011 |
| Oligodendroglioma | | |
| 1 x 1.5 cm bony mass maxillary sinus | | 3/12/2009 |
| Grade I spondylolisthesis, S/P left hemi laminectomy L5 | MRLS | |
| FX T12 | | |
| multiple laminectomies | | |
| hnp c5/6 | CT | 6/4/2010 MRI |
| Diverticulitis | | 5/14/2008 |
| Metaphyseal Bone Tumor | | |
| Gallstones | CTC | 5/12/2011 |
| Osteomyelitis ***** | | 9/8/2011 |
| Overcall | | |
| Rib Lesions | CXR | |
| Overcall | | |
| multiple cavities with air fluid levels | CXR | |
| ext occipital protruberance called sebacious cyst | | |
| Juxtaarticular synovial cyst | MRLS | 10/20/2009 |
| Ca++ Left Carotid Artery | CS | 8/23/2011 |
| 13 mm osteoma sphenoid sinus | | |
| Mets. "neoplasm producing these changes | | |
| thought much less likely" | | |
| Arachnoiditis | MRLS | |
| Grade I spondylolisthesis with spondylolysis L5/S1 | | |
| Arachnoiditis, neurogenic bladder, impotence, | | 11/4/2009 |
| incontinence, burning pain | | |
| Lung CA subtle | CXR | 1/3/2011 |
| 2 x 2 x 5 cm cyst | | |
| False + "3 mm meningioma" | CTB | |
| Called 7 mm nodes (false+) missed 3 findings | | |

|  |  |  |
|---|---|---|
|  |  | 12/18/2008 |
| Thyroid enlargement | CXR | 10/27/2010 |
| False Positive: CT Sinuses: "There is a small foci (sic)of increased density | | 6/2/2011 |
| of increased density within the brain stem on the left, image 21 | | |
| Impression: 3) Small hyperdense foci (sic) within the brainstem | | |
| on the left. Small intraparenchymal mass or hemorrhage not excluded. | | |
| Dedicated CT brain without and with contrast recommended for | | |
| evaluation. | | |
| "may have been artifactual in nature" | | 6/30/2011 |
| prominent ascending aorta possible AS | | 1/6/2009 |
| False Positive: Impression: 28 mm nodular opacity left upper chest | | 11/16/2010 |
| CT recommended for further evaluation. [ No nodule on CT] | | |
| Mammary implants | | 11/9/9/09 |
|  | | 11/22/2004 |
|  | | 11/25/2002 |
|  | | 11/16/2011 |
|  | | 3/17/2011 |
| Multiple large bullae/cysts up to 4.8 x 9.2 cm | | 5/2/2008 |
|  | | 10/4/2006 |
| Fx both clavicles: "fx left clavicle is "noted" | | 11/22/2011 |
| Ca++ Carotid Bifurcations in neck | | 10/21/2010 |
| 3 x 10 mm exostosis, hammer toes | | 3/1/2011 |
| S/P Vasectomy clips | hip | 11/13/2009 |
| Spondylolysis L5R "No pars defect identified in non internally fixated | | 6/16/2010 |
| areas" | | |
| Enlarged right thyroid | CXR | 5/16/2011 |
| 7 cm HH | CXR | 6/27/2008 |
|  | CXR | 12/16/2003 |
| Epidural lipomatosis L5/S1 | MRI | 7/31/2009 |
| False Positive: " Nonenhancing  8 x 5 mm low density foci [sic] just | CT | 11/10/2011 |
| posterior to right CPA .. Uncertain etiology and epidermoid or cystic | | |
| neoplasm not excluded.  MRI indicated." Neg MRI 12/1/11 | | |
| Ca++ Carotid Bifurcations in neck | | 9/00/10 |
| Cavities RLL | CXR | |
| Prob arachnoiditis | | |
| Spondylolitis | | |

**EXHIBIT 7**

THIS IS AN IMPORTANT RECORD
SAFEGUARD IT

| PERSONAL DATA | 1 LAST NAME—FIRST NAME—MIDDLE NAME | 2 SERVICE NUMBER | 3 SOCIAL SECURITY NUMBER |
|---|---|---|---|
| | MIDYETT  FREEMAN  ALLAN | ~~~~~~ | ~~~~~~ |

| 4 DEPARTMENT, COMPONENT AND BRANCH OR CLASS | | 5a GRADE, RATE OR RANK | 5b PAY GRADE | 6 DATE OF RANK | 26 Sep | 69 |
|---|---|---|---|---|---|---|
| AIR FORCE (AFRES) | | Major | O-4 | 7 DATE OF BIRTH | 20 Sep | 41 |
| 8 CITIZEN ☒ YES ☐ NO | 9 PLACE OF BIRTH (City and State or Country) | | | | | |
| | Memphis, Tennessee | | | | | |

| SELECTIVE SERVICE DATA | 10a SELECTIVE SERVICE NUMBER | 10b SELECTIVE SERVICE LOCAL BOARD NUMBER, CITY, COUNTY, STATE AND ZIP CODE | 10c DATE INDUCTED |
|---|---|---|---|
| | NA | NA | NA |

| TRANSFER OR DISCHARGE DATA | 11 TYPE OF TRANSFER OR DISCHARGE | 12 STATION OR INSTALLATION AT WHICH EFFECTED | |
|---|---|---|---|
| | Release from Active Duty | Davis-Monthan AFB, Arizona | |
| | 13 REASON AND AUTHORITY | | 14 DATE 1 Jul 72 |
| | SPD 615, para 63, AFM 36-12. | | |
| | 15 LAST DUTY ASSIGNMENT AND MAJOR COMMAND | 16 TYPE CHARACTER OF SERVICE | 17 NA |
| | USAF Reg Hosp          (SAC) | HONORABLE | NA |
| | 18 DISTRICT AREA COMMAND OR CORPS TO WHICH RESERVIST TRANSFERRED | | 19 NA |
| | Air Force Reserves | | NA |

| 20a TERMINAL DATE OF RESERVE | | 20b CURRENT ACTIVE SERVICE OTHER THAN BY INDUCTION | | 21 | 22 |
|---|---|---|---|---|---|
| DAY | MONTH | YEAR | ☐ ENLISTED (First Enlistment) ☐ ENLISTED (Prior Service) ☐ REENLISTED | Jul | 70 |
| NA | | | ☒ OTHER  Ordered to EAD | | |

| 23 PRIOR REGULAR ENLISTMENTS | 24 GRADE, RATE OR RANK AT TIME OF ENTRY INTO CURRENT ACTIVE SVC | 25 PLACE OF ENTRY INTO CURRENT ACTIVE SERVICE (City and State) |
|---|---|---|
| (O) None | Major O-4 | Rochester, Minnesota |

| 26 HOME OF RECORD AT TIME OF ENTRY INTO ACTIVE SERVICE | 27 STATEMENT OF SERVICE | YEARS | MONTHS | DAYS |
|---|---|---|---|---|
| 923 B Homestead Village Lane, | (a) NET SERVICE THIS PERIOD | 02 | 00 | 00 |
| Rochester, Minnesota  55901 | (b) OTHER SERVICE | 08 | 09 | 00 |
| 28a SPECIALTY NUMBER & TITLE | 28b RELATED CIVILIAN OCCUPATION AND D.O.T. NUMBER | (c) TOTAL (Line a plus line b) | 10 | 09 | 00 |
| X9536 - Radiologist | Radiologist 070.108 | (d) TOTAL ACTIVE SERVICE | 02 | 00 | 00 |
| | | (e) FOREIGN AND/OR SEA SERVICE | 00 | 00 | 00 |

29 DECORATIONS, MEDALS, BADGES, COMMENDATIONS, CITATIONS AND CAMPAIGN RIBBONS AWARDED OR AUTHORIZED

AFCM////

30 EDUCATION AND TRAINING COMPLETED

None////

| 31 | 32 | 33 | 34 |
|---|---|---|---|
| To Whom Sent | 05.0 | NA | NA |
| | 35 c. 42258527 | | |

36 REMARKS

College - D, 1965, Univ of Tennessee
Blood Group - O Pos
IMO, Aug 66, 4th CCRI
OSD: 2 Jul 70 None

| 37 PERMANENT ADDRESS FOR MAILING PURPOSES | 38 SIGNATURE |
|---|---|
| 3266 Deerwood Ave., | ~~signature~~ |
| Lincoln, Nebraska  68123 | |
| C.A. SUPERMAN, TSGT, USAF | ~~signature~~ |
| OIC, PROJECT TRANSITION | |

DD FORM 214

**EXHIBIT 8**



**UNITED STATES**
**DEPARTMENT OF VETERANS AFFAIRS**

# Veterans Health Care System of the Ozarks

Site Home > Our Doctors > F. Allan Midyett, MD

### F. Allan Midyett, MD

| | |
|---|---|
| **Field:** | Imaging/Radiology |
| **Board Certifications:** | Diagnostic Radiology |
| | Neuroradiology |
| **Education:** | MD, UNIVERSITY OF TN, COLLEGE OF MEDICINE |
| **Licensed In:** | District of Columbia |
| | North Carolina |
| **Provider Type:** | Physician |
| **Gender:** | Male |
| **Location:** | Veterans Health Care System of the Ozarks |
| *[click facility name to view details]* | 1100 N. College Avenue |
| | Fayetteville, AR 72703 |
| | 479-443-4301 |

U.S. Department of Veterans Affairs - 810 Vermont Avenue, NW - Washington, DC 20420

Reviewed/Updated Date: March 13, 2012

**EXHIBIT 9**

DEPARTMENT OF VETERANS AFFAIRS
ASSISTANT SECRETARY FOR HUMAN RESOURCES AND ADMINISTRATION
WASHINGTON DC 20420

## JUL - 8 2011

MEMORANDUM FOR UNDER SECRETARIES, ASSISTANT SECRETARIES, OTHER KEY OFFICIALS, AND FIELD FACILITY DIRECTORS

SUBJECT: Prohibited Discrimination: Retaliation

The Department of Veterans Affairs (VA) is strongly committed to equal employment opportunity (EEO) and diversity in the VA workplace. To this end, on June 13, 2011 , Secretary Shinseki issued a Policy Statement to all employees summarizing VA's EEO, Diversity, and No FEAR Policies. The Statement clearly articulates that all forms of prohibited discrimination, including retaliation , would not be tolerated in VA.

Recent EEO reports have indicated that retaliation/reprisal continues to be the most prevalent basis upon which discrimination complaints are filed in VA. I want to take this opportunity to reaffirm VA's policy and remind managers and supervisors of their obligations to maintain an environment free from discrimination and reprisal.

In the area of employment discrimination, retaliation or reprisal is defined as any negative treatment or adverse action imposed upon an individual for engaging in protected activity, which includes filing a charge of discrimination, participating in an employment discrimination proceeding, or otherwise opposing unlawful discrimination. This includes any behavior that may reasonably dissuade someone from exercising his or her rights granted by the applicable civil rights laws.

Managers and supervisors bear a special responsibility and legal obligation to ensure that they don't engage in or tolerate retaliation in the workplace. To assist you with gaining a better understanding in this area, please see the attached Frequently Asked Questions on what constitutes unlawful retaliation or reprisal. Supervisors and managers are encouraged to contact their local EEO Manager, the Office of Resolution Management, or the Office of General Counsel for more guidance on this topic. Additionally, the Office of Diversity and Inclusion provides training and conSUltation in the area of EEO and diversity.

As we continue to transform VA into a high performing 21 st century organization, it is imperative that we cultivate a fair and inclusive work environment that protects the rights of all individuals in the workplace. Please ensure that all managers and supervisors are informed about this and understand their responsibilities. Thank you for your support.

:John U. Sepulveda

Attachments

## Frequently Asked Questions

## Retaliation/Reprisal

The Equal Employment Opportunity Commission (EEOC) reports that retaliation is the most frequently alleged basis of discrimination in the Federal government. An employer is prohibited from taking an adverse action based on an employee's prior EEO activity. What lessons can VA managers learn from recent EEOC decisions to prevent findings of discrimination? The scenarios below reflect cases where VA was found to have

committed a per se violation or retaliated against an employee. Per se retaliation/ reprisal is an automatic violation of the law against reprisal that does not require evidence of an "adverse action." Per se violations occur when management officials make negative comments or take action against an individual who participates in the EEO process in any capacity. The responses to the following scenarios can be used as a valuable tool to assist managers in preventing and eliminating retaliation/reprisal and other forms of discrimination in the workplace.

1. I was in the midst of approving the reassignment of an employee to a different position when I received a call from an EEO counselor indicating that the employee had initiated an EEO complaint against me. I am not sure what the complaint is about, so I will deny the reassignment until I learn what the complaint is about because I do not want it to appear that I am moving her because she has filed an EEO complaint. *Was this the right thing to do?* Delaying actions after an employee initiates an EEO complaint can be viewed as retaliation/reprisal. Managers should always ask themselves "Would I take this course of action if the employee did not have a complaint?" If the answer is no, then the action is not advisable, as it sends a message that because an employee used the EEO process, management may take a retaliatory action against them. The motivation to take or not to take an action ~ased on an employee's participation in the EEO process constitutes prohibited retaliation/reprisal in violation of Title VII of the Civil Rights Act. Provisions of Title VII of the Civil Rights Act that govern retaliation/reprisal are broad and make discrimination against an individual because of his or her protected EEO activity, unlawful. These provisions prohibit any discrimination that is reasonably likely to deter a complainant from participating in protected EEO activity.

2. Carol has filed an EEO complaint and the case is scheduled for a hearing. She alleges that I discriminated *against her when she was placed on absent without leave* (AWOL). I just learned that Carol is going to call Donna as a witness. I hired Donna a couple of months ago; she is a recent college graduate and has no clue about what goes on in the Federal workplace. *Is it ok for* me to *warn Donna that Carol is a troublemaker and that she "crossed the line" when she filed her complaint?*

1

It is always inappropriate (and illegal!) for a supervisor or other VA management officials to dissuade an employee from participating in the EEO process, including testifying for, or serving as a representative on behalf of a complainant. It is also illegal for VA management officials to suggest or infer that an employee who files an EEO complaint is a "troublemaker".

Witnesses who testify in EEO hearings are protected from retaliation/reprisal by VA management officials. Depending on the circumstances, a potential witness may also be protected if she is the target of an adverse action by her supervisor or other management official as a result of being identified as a potential witness. Targeting can take many forms including issuing a letter of warning, lowering a performance evaluation, denying a leave request, or non-selection for promotion.

3. I was on a selection panel for a motor vehicle operator position. I attended a meeting with Human Resource officials regarding the selection process where the applicant's prior EEO activity was disclosed as well as the qualifications of both candidates. The panel found both candidates to have similar qualifications;

however, not all members agreed on what type of experience was the most valuable and gave credit to each candidate using different job experiences. The panel also discussed their concern that one of the employees had a prior history of filing EEO complaints which could lead to future complaints. Therefore, the oth~r candidate was selected. *Was it appropriate* to *discuss the employee's prior EEO activity while determining the best applicant for the position?*

An individual's prior EEO activity must never be discussed or considered when determining the best qualified candidate for a position. In essence, an individual's EEO activity should not be shared at all during the selection process. Selections must be based on merit principles; a review of the qualifications required for the position, and each candidates ability to meet those qualifications as evidenced by their work history. The Civil Service Reform Act (CSRA), codified (5 U.S.C. Section 2301) the basic merit prinCiples governing Federal personnel management. These principles specify that selection and promotion should be based solely on merit, after fair and open competition.

Further, trying to justify a selection decision by simply stating that the selectee was "better qualified" absent a clear and specific explanation may result in a finding of discrimination, particularly, when it appears, at least on paper, that the candidate that was not selected actually had superior qualifications. For example, management should be able to articulate what skills, abilities, and experience the selectee had to make them better qualified to perform the duties of the position. An inference of retaliation/reprisal arises when there is proof that the protected EEO activity and the adverse action taken against the employee are related. This inference may arise even if a significant amount of time has elapsed between the protected activity and the adverse action if there is other evidence that points to retaliation/reprisal. Even if management produces evidence of a legitimate, nondiscriminatory reason for the action at issue, a violation

2

could still be found if this explanation is a pretext designed to hide the true retaliatory motive.

4. Steve, one of my subordinates, keeps filing EEO complaints. He is always spending time in Human Resources, but otherwise is an excellent employee. I want to put something in his performance evaluation to reflect how *much* time he is spending on his EEO complaints. *Can I do this?*

An employee's EEO activity has no relationship to his work performance. Statements about EEO activity may constitute per se retaliation/reprisal and must not be included in VA performance evaluations. Likewise, it is illegal to provide an employment reference that identifies, discusses, or offers an opinion about an individual's EEO activity.

*VA employees are entitled to a "reasonable amount of official time" to pursue their EEO* complaints. An employee who serves as a complainant's representative is also entitled to official time. For further guidance about what constitutes a "reasonable amount of official time" contact your local EEO Program Manager and/or Regional Counsel.

5. In October 2009, Marcus, a Food Service Leader, who is one of my employees, participated in EEO activity. He had expressed his concern to me that there was a difference in assignments given to older and younger employees. In June 2010, Marcus contacted an EEO counselor and alleged that I assigned him less desirable work more often than his co-workers in retaliation/reprisal for his prior EEO activity in October 2009 and contrary to the agency's policy. I'attest that

Marcus' assignments were made for business related purposes. *Is there something wrong with using my own judgment rather than relying* on *agency policies?*

Management's reason was found to be pretextual because the employee's assignments violated agency policy. Pretext means that the explanation given by management is just an excuse and not the real reason for the action taken.

It is important for management officials to follow agency policy and not deviate from it when carrying out personnel actions without justifiable and credible reasons. It may raise red flags, if an EEO complaint is filed, particularly, by an employee who has previously filed. In this case, the manager did not specifically answer why Marcus received more of the less desirable jobs; more to the point, how did this turn of events relate and/or impact the business that led to Marcus' receipt of more of the less desirable assignments? Management must also be able to articulate a legitimate nondiscriminatory

reason (Le., state the business case) for its actions. It is possible that if management had provided a detailed reason explaining the deviation of assignments from the usual policy, the result may have been different. In any event, this situation highlights the fact that managers need to be careful not to depart from normal procedures.

3

Note: Failure to follow agency's procedures led to this finding of retaliatory discrimination. Many employees, after having filed a discrimination complaint almost always believe that any negative or suspect action taken against them afterwards is retaliatory .

6. Last month I removed Tina during her probationary period and she filed a discrimination complaint against me. Jack is one of my subordinates and Tina's friend. I expect loyalty from my staff and I don't want Jack helping Tina with her complaint. *Since Jack works for* me, *can I tell him not to assist Tina with her complaint?*

Third parties participating in the EEO process are protected from retaliation/reprisal even if they do not feel that they are personally discriminated against. Participation may include assisting an aggrieved employee with her complaint by participating in an investigation or providing a written or oral statement in support of the employee. Thus, it is illegal for a VA supervisor or other management official to advise subordinate staff that they cannot assist a co-worker with her complaint.

However, there are VA policies governing the use of official time for such purposes. To access the "Official Time" guidance, please visit: http://vaww4.va.gov/orm/departments/LR/ormlr/toolboxes/docs/OTFAQS.pdf.VA supervisors and management officials must not discuss an employee's ongoing EEO activity with subordinate staff, unless the staff member is involved in processing, investigating, mediating, or litigating the complaint. Management officials must cooperate in the EEO process including investigations. Failure to cooperate in an EEO investigation may lead to disciplinary action, up to and including removal.

7. If an employee filed a previous EEO complaint against me, and subsequently, complains to me that another co-worker is telling insensitive jokes in his/her presence, and I don't think the jokes are insensitive at all. *What should I do since the jokes were not directed* at *the employee who complained?*

Whether or not you believe the jokes were insensitive, management has a responsibility to immediately address the issue. Management is under an obligation to do whatever is necessary to end harassment and prevent misconduct from recurring regardless of whether or not the employee who raised the concern has previously filed an EEO complaint, or whether or not management regards the employee as overly sensitive. Management can be found liable for retaliation/reprisal if they fail to exercise reasonable care to prevent retaliatory harassment. Incidents of harassment must be addressed promptly. Failure to take corrective measures in a timely fashion can result in a finding of discrimination, in so far that acting too late is the equivalent of not acting at all. It is advisable that management meet with the employee and share the conclusion after looking into the matter. VA managers and supervisors have a special responsibility in maintaining a work environment free from discrimination and harassment. All VA managers and supervisors are required to complete mandatory training in EEO,

4

Diversity, and Conflict Management every two years. This training can be found using the Talent Management System at https://www.tms.va.gov/plateau/user/login.jsp. If you complete the training using this method, it satisfies the every two year requirement.

8. Sam went to the union alleging that Nancy was sexually harassing him. I supervise both Sam and Nancy. I think Sam is making this whole thing up. I want to tell the union that Sam better be telling the truth, because if he is not, I am going to take disciplinary action against him. *Should I do this?*

It is illegal for VA supervisors and management officials to make statements or engage in conduct that might cause an employee to refrain from engaging in protected EEO activity. Such statements or actions constitute "per se retaliation/reprisal" and are an automatic violation of anti-discrimination laws. A finding of discrimination involving "per se retaliation/reprisal" does not require evidence that the VA discriminated against the employee. When VA supervisors and management officials engage in "per se retaliation/reprisal, by making statements that intimidate or threaten disciplinary action, it has a chilling effect on employees' rights to participate in the EEO process or voice opposition to discriminatory practices. The EEOC has determined that retaliation/reprisal harms the public interest by deterring others from filing complaints.

9. An employee filed a prior EEO complaint against me for counseling her regarding her time and attendance. Shortly thereafter, she was issued a letter of admonishment suspending her supervisory duties pending an investigation into patient abuse. Although the investigation did not reveal patient abuse occurred, I did not remove the suspension until six months later, because I forgot. *Should I have removed the suspension immediately upon learning of the results of the investigation since that is the policy of the department?*

There was no justifiable reason to continue to suspend the employee's supervisory duties after it was learned that no patient abuse occurred. The purpose of an Administrative Investigation Board is to determine whether or not misconduct occurred through the examination of relevant evidence, to include both testimonial and documentary. The evidence compiled during the investigation can be used to form the foundation of disciplinary and/or adverse action if it is discovered that misconduct has been committed. If, alternatively, no misconduct is evident, no further action need be taken against an employee, particularly when to do so, would be contrary to policy and common practice.

Managers should be mindful that employees are very sensitive to any actions management takes against them, after they have filed an EEO complaint. It is always a good practice to be certain that actions taken against an employee after an EEO complaint has been filed, is warranted and the complainant is treated the same as any other employee in a similar situation.

5

10. Kevin filed a complaint saying that I discriminated against him because of his religion. I am personally offended by his statements. *Can I tell him how I feel?*
No supervisor or manager likes when an EEO complaint is filed identifying him/her as the individual responsible for the action alleged to have been discriminatory. You may feel offended, angry, or disappointed that a member of your staff would take such an action. However, it is never appropriate for VA managers and supervisors to publicly express hostility toward the EEO complaint process or the employee who filed the complaint. Such statements often are found to be "per se retaliation/reprisal" as discussed above.
If you feel personally offended or hurt that a complaint has been filed against you, discuss your feelings with the EEO Program Manager or Regional Counsel.

11. An employee in my section alleges I retaliated against her when I sent an email to all of the employees in my department asking them for statements I could use to defend myself against an EEO complaint she had filed against me. *Were my actions inappropriate?*
Anti-retaliation/reprisal provisions protect individuals from any actions that would likely discourage a reasonable person from participating in the EEO process. These actions are not limited to actions that are typically considered to be adverse in nature, such as disciplinary or performance based actions. They may take the form of any management decisions or actions that interfere with an employee's ability to pursue a complaint. Managers must avoid creating an atmosphere in which employees are reluctant to exercise their EEO rights for fear of retaliation.
After reviewing the facets of this case, management's e-mail to several employees in the section was the type of conduct reasonably likely to deter and dissuade individuals from engaging in EEO protected activity. Therefore, this action constituted prohibited reprisal discrimination.

12. An employee filed an EEO complaint against me and several months later, submitted an untimely leave request for 40 hours. The leave request was submitted two days before the leave was to begin. In accordance to the leave policy, employees are to request leave at least two weeks in advance to ensure there is proper staff coverage and pending projects are completed. I have held all employees accountable for following this procedure. I met with the employee to explain that her leave is denied because she failed to follow proper leave procedures and her request conflicts with the second extension granted to complete the John Doe project. The employee was dissatisfied with my decision and took the leave anyway. Upon her return, I issued her a letter of admonishment, which disclosed that she was carried in an absent without leave status, because she was AWOL. The employee said that she did not agree with the admonishment. She believed that I was retaliating against her, because she
6
previously filed an EEO complaint against me. *Should I have issued her the letter*

of *admonishment* or *ignored the fact that she took the leave without approval and not have disciplined her for fear of perceived retaliation?*

Consistent with a manager or supervisors role and responsibilities, management should not avoid taking appropriate corrective action(s) against employees who have filed previous EEO complaints against them, if there is a legitimate, lawful, objective reason for taking such action.

To avoid the appearance of giving preferential treatment, management has an obligation to enforce policies and procedures equitably. By enforcing employees to adhere to leave policies, it helps managers and supervisors better administer the workload to prevent undue hardship on the organization and other employees.

13. Next month I will become the Director of the "Any Town USA, VA Medical Center." This is my first supervisory assignment and I want to make a difference. Everyone knows that this facility is dysfunctional and has had a lot of EEO activity during the past three years. I am holding an "All Hands" meeting when I arrive. *Can I tell employees that we need to reduce our EEO complaints, if we ever want to win an award for organizational excellence?*

When VA managers and supervisors publicly discuss the EEO process, their focus should be on their strong commitment to equal employment opportunity, diversity and inclusion, and workplace dispute resolution. Every supervisor and manager bears a special responsibility to ensure that discrimination is not tolerated in VA and that diversity is valued.

On an annual basis, you and your staff should review VA's workplace policies dealing with EEO, diversity and inclusion, and discuss the expectations of these policies. If you need additional assistance in facilitating such a discussion, contact your local EEO Program Manager.

**EXHIBIT 10**

Home Page  Legal & Policies  VA EEO Policy
EEO Policy New Guidance
VA EEO Policy


March 14, 2012

TO ALL EMPLOYEES

SUBJECT: The Secretary's EEO, Diversity, and No FEAR Policy Statement

I expect that each of us is familiar with and committed to our Department's equal employment
opportunity (EEO), diversity and inclusion, and workplace conflict resolution goals in serving
our Nation's Veterans.

VA emphasizes Integrity, Commitment, Advocacy, Respect and Excellence (I CARE) as our
Core Values. Your embrace of I CARE is critical to ensure a VA environment that enables full
participation, encourages diverse perspectives, and actively supports constructive conflict
resolution. We must be vigilant and proactive in eliminating discrimination. It is our personal and
professional responsibility to recognize, report, and help stop unlawful discrimination, workplace
harassment, and retaliation. I CARE embraces diversity and inclusion, and empowers all of us
who are privileged to work at VA to contribute our fullest potentials to VA's mission.

Supervisors and managers bear ultimate responsibility for promoting the complementary
principles of equity, diversity, and inclusion in the workplace. They are obligated to enforce the
standards for appropriate workplace behavior and must take prompt action on any conduct that is
unlawful. To do this well, we must set the example. Veterans and their families deserve our
unwavering leadership in promoting a fair, diverse, and inclusive environment.

The attached Policy Statement provides a summary of VA's workplace policies with respect to
EEO, diversity, and inclusion. Review the Policy Statement with your staff and colleagues and
encourage discussion of these expectations. Your leadership and participation remain crucial at
this time.
Eric K. Shinseki

Attachment

Summary of VA's EEO, Diversity, and No FEAR Policies

The Department of Veterans Affairs (VA) is committed to ensuring equal employment
opportunity (EEO), promoting diversity and inclusion, and constructively resolving workplace
conflict in order to maintain a high performing workforce in service to our Nation's Veterans. To
that end, the Department will vigorously enforce all applicable Federal EEO laws, regulations,
executive orders, and management directives to ensure equal opportunity in the workplace for all
VA employees. VA is strongly committed to reminding managers and supervisors of their

obligations to maintain an environment free from discrimination, reprisal and retaliation actions. This document summarizes VA's EEO and diversity-related policies. For additional information, please consult the references listed at the end of this memorandum.

EEO and Prohibited Discrimination

VA will not tolerate discrimination or harassment on the basis of race, color, religion, national origin, sex, pregnancy, gender identity, parental status, marital status, sexual orientation, age, disability, genetic information, political affiliation, or retaliation for opposing discriminatory practices or participating in the discrimination complaint process. This applies to all terms and conditions of employment, including recruitment, hiring, promotions, transfers, reassignments, training, career development, benefits, and separation. In addition, VA will provide reasonable accommodation to qualified individuals with disabilities, and accommodations for religious practices, in accordance with applicable laws and procedures.

VA's Office of Resolution Management (ORM) is responsible for administering an impartial and effective complaints-management process to address and resolve complaints of employment discrimination at the earliest possible stage. Employees may report allegations of discrimination to ORM at (888) 737-3361. The regulations governing the Federal EEO complaint process are found in 29 CFR Part 1614. Employees seeking redress under this process must contact an EEO Counselor in person, by phone, or in writing within 45 calendar days of the date of the alleged incident. Employees may also report allegations to their immediate local facility EEO program manager, a management official in their chain of command; or they may raise discrimination issues through the Negotiated or Administrative Grievance Process, as appropriate. While a discrimination allegation may be raised through these additional avenues, it does not constitute initiation of an EEO complaint with an EEO Counselor through the federal sector EEO complaint process and it does not extend the 45 calendar-day time limit to initiate an EEO complaint with the ORM.

While sexual orientation, gender identity, genetic information, parental status, marital status, and political affiliation are not listed as protected bases in Title VII of the Civil Rights Act, discrimination on these bases is strictly prohibited by VA. Complaints of discrimination filed on these bases will be processed according to the aforementioned Federal EEO complaint process up to and through the investigation stage of the EEO process. The VA Office of Employment Discrimination Complaint Adjudication will issue a Final Agency Decision on the merits of the claim within 60 days of its receipt of the complaint file. Complaints filed solely on this basis will not proceed to the U.S. Equal Employment Opportunity Commission. Other avenues of redress available to raise a claim of discrimination based on sexual orientation, gender identity, genetic information, parental status, marital status, and political affiliation include the Negotiated or Administrative Grievance Process, both of which permit claims of discrimination, and if otherwise appealable, raising the matter with the U.S. Office of Special Counsel and/or the Merit Systems Protection Board if the claim of discrimination is coupled with adverse impact and/or prohibited personnel practices. While a discrimination allegation may be raised with these avenues, it does not constitute initiation of a complaint through this internal complaint process and it does not extend the 45 calendar-day time limit to initiate such complaint with the Office of

Resolution Management.

Accommodations

VA is committed to providing reasonable accommodation to qualified individuals with disabilities in accordance with law, unless doing so poses an undue hardship as provided by the applicable law. For people with disabilities, a reasonable accommodation is any change in the work environment or in the manner work is accomplished that enables them to apply for a job, perform the essential functions of their jobs or enjoy equal benefits and privileges of employment. Individuals who believe they need such accommodation should request accommodation from anyone in their chain of command, human resources, or EEO. The procedures for requesting and processing requests for reasonable accommodation are contained in VA Directive 5975.1. Denials must be discussed with the VA Disability Program Manager or the local general counsel before conveying the denial to the employee. VA has also established a centralized reasonable accommodation fund to refund costs associated with some accommodations. For information on this, contact the Office of Diversity and Inclusion.

VA is also committed to providing religious accommodations to employees. Title VII of the Civil Rights Act of 1964 (Title VII) prohibits employers from discriminating against individuals because of their religion in hiring, firing, and other terms and conditions of employment. Title VII also requires employers to reasonably accommodate the religious practices of an employee or prospective employee, unless to do so would create an undue hardship upon the employer. Individuals who believe they need such accommodation should request accommodation from immediate supervisors.

Alternative Dipsute Resolution

Conflict in the workplace is inevitable. Left unmanaged, it can lead to organizational disruption, high attrition, low productivity, and poor employee morale. To maintain a respectful, productive, and harmonious work environment, it is the policy of VA to resolve workplace disputes at the earliest possible stage. VA offers Alternative Dispute Resolution (ADR) services such as mediation and facilitation to assist parties in resolving conflicts constructively. ADR involves a neutral third-party working with the employee, supervisor, or group to engage in constructive communication, identify issues and concerns, and develop collaborative solutions. I encourage all VA employees to consult with their Administration's ADR Coordinator or VA's Workplace ADR program for assistance in resolving workplace disputes quickly and informally.

Workplace Harassment

Harassment is a form of discrimination and will not be tolerated. Workplace harassment is defined as any unwelcome, hostile, or offensive conduct taken on the bases listed above under prohibited discrimination that interferes with an individual's performance or creates an intimidating, hostile, or offensive work environment. Harassment by or against VA employees, applicants, contract employees, clients, customers, and anyone doing business with VA is prohibited.

Sexual harassment is a form of sex discrimination that involves unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when: (1) submission to or rejection of such conduct is made either explicitly or implicitly a term or condition of one's employment, or (2) submission to or rejection of such conduct by a person is used as a basis for career or employment decisions affecting that person; or (3) such conduct interferes with an individual's performance or creates an intimidating, hostile, or offensive work environment.

Both supervisors and employees bear responsibility in maintaining a work environment free from discrimination and harassment. Employees must not engage in harassing conduct and should immediately report such conduct to their supervisor, another management official, collective bargaining unit, Employee Relations Specialists, Labor Relations Specialists, or ORM, as appropriate. Harassment claims will be handled confidentially to the greatest extent possible. If an employee brings an issue of harassment to a supervisor's attention, the supervisor must promptly investigate the matter and take appropriate and effective corrective action, as necessary. Allegations of discrimination and harassment will be taken seriously and appropriate corrective action—up to and including termination—will be taken if allegations are substantiated. Supervisors are strongly encouraged to seek guidance from their local EEO Manager, ORM, Employee and Labor Relations staff, or the Office of the General Counsel when addressing issues of discrimination or harassment.

No FEAR/Whistleblower Protection

Retaliation and reprisal against Federal employees for opposition to discrimination, or participation in the discrimination-complaint process is unlawful and will not be tolerated. These protections are ensured by the Notification and Federal Employee Antidiscrimination and Retaliation Act (No FEAR Act of 2002 - Public Law 107-174). VA prohibits retaliation and reprisal against Federal employees or applicants for employment who report violations of law, official wrongdoing, including gross waste, fraud and abuse of authority. These protections are ensured by the Whisteblower Protection Act (5 U.S.C. § 2302 (b) 8). Additionally, the right of employees, individually or collectively, to petition Congress or a Member of Congress, or to furnish information to either House of Congress, or to a committee or Member thereof, may not be interfered with or denied (5 U.S.C. § 7211). Protected individuals include complainants, witnesses, and others who provide information concerning such claims. The U.S. Office of Special Counsel (OSC), an independent agency of the Federal government, is responsible for addressing such retaliation or reprisal complaints. OSC is responsible for investigating all prohibited personnel practices regardless of original contact.

Mandatory Prevention of Workplace Harassment, No FEAR, EEO, Diversity, and Conflict Management Training

The No FEAR Act of 2002 requires all employees to take No FEAR training within 90 days of their initial hire and every 2 years thereafter. VA also requires workplace harassment prevention training for all employees every 2 years. This training is available to all employees through the VA Talent Management System (TMS). Managers and supervisors are also required to take

mandatory EEO, Diversity and Conflict Management Training for Managers and Supervisors every 2 years. This training is mandatory for all senior executives, managers, and supervisors and is available in face-to-face format and on-line via the TMS.

Toward Diversity and Inclusion

To be an exceptional Federal agency, we must cultivate an inclusive work environment that reflects the diversity of our global community. Diversity and inclusion in the workplace are more than legal imperatives; they are business imperatives in this millennium. This begins with eliminating barriers on the legally protected bases, yet does not end there. To be fully inclusive, we must define diversity broadly and leverage the diverse talents of all our human resources. Our Nation's Veterans are best served when we create an environment that is free of barriers to full participation, values diversity of perspectives, and empowers every individual to contribute to his or her fullest potential. Each one of us bears the responsibility to ensure that discrimination is not tolerated and that diversity is valued. We all share the responsibility to ensure we promote the complementary principles of equity, diversity, inclusion and respect in the VA workplace.

\_\_/signed/_____      March 14, 2012

Secretary of Veterans Affairs                                Date

**EXHIBIT 11**

1. Mercy Imaging Centers - Folsom, CA, (California)
   www.healthgrades.com/group.../mercy-imaging-centers-414bde33
   Specialties: Diagnostic Radiology, **Interventional Radiology** & Vascular Radiology,
   Nuclear ... Dr. Kathryn **Witztum**, Nuclear Medicine, Free Profile for Dr. **Witztum** ...

2. Mercy Imaging Center Of Carmichael - Carmichael ... - HealthGrades
   www.healthgrades.com/.../mercy-imaging-center-of-carmichael-2814...
   Specialties: Cardiology, Diagnostic Radiology, **Interventional Radiology** & Vascular
   Radiology, ... Dr. Kathryn **Witztum**, Radiology, View Profile for Dr. **Witztum** ...

   Show map ~~of~~ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ ~~93608~~

3. Mercy Imaging Center Of Carmichael - Carmichael ... - HealthGrades
   www.healthgrades.com/group-directory/california-ca/.../-2814b9bd
   Specialties: Cardiology, Diagnostic Radiology, **Interventional Radiology** &
   Vascular ...Dr. Kathryn **Witztum**, Nuclear Medicine, View Profile for Dr. **Witztum** ...

4. Dr. KATHRYN **WITZTUM** - Carmichael, CA **Radiologist doctor** ...
   www.ratemds.com/.../Dr-KATHRYN-**WITZTUM**-CARMICHAEL-C...
   Carmichael CA - doctor - CHW MEDICAL FOUNDATION
   Free doctor reviews and ratings for Radiologist Dr. KATHRYN **WITZTUM** ... and general
   angiography, **interventional radiology**, ▓▓▓ ▓▓ medicine procedures ...

5. KATHRYN FLAKE **WITZTUM** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓...
   www.labdraw.com/doctorlocations.php?doctor=1487683603
   KATHRYN FLAKE **WITZTUM** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
   0438 ...**Interventional radiology** uses the imaging modalities of diagnostic radiology
   ~~to~~ ...

6. Kathryn Flake **Witztum** - **Radiology, Radiology** - Sacramento - CA ...
   www.carionltd.com/doc.php?st=ca&cy...pn...flake-**witztum**...
   Kathryn Flake **Witztum** - Radiology, Radiology - Sacramento - CA - 916-363-
   ▓▓▓▓ ...Radiology, Radiology, Vascular & **Interventional Radiology** ▓▓▓▓▓▓▓▓▓...

120 Michigan    135 Minnesota    112 Mississippi
87 Missouri    63 Montana    98 Nebraska
59 Nevada    186 Ohio    136 Oklahoma
48 Oregon    146 Pennsylvania 64 Tennessee
16 Utah    3 Vermont    18 Virginia
29 Washington 47 Wisconsin    19 Wyoming

Home Doctors Neuroradiology California Sacramento **Dr. Kathryn Flake Witztum**

 **Dr. Witztum**

Are you this doctor?
Update your profile here.

AdChoices ▷

**EHR Software Demo**
Watch the EHR Demo Online Now Top-rated EHR, Billing, Scheduling
EHR-Software.Advanced...

**Common Rating**

Dr. Kathryn Flake Witztum not rated yet
Add review

## Dr. Kathryn Flake Witztum

**Neuroradiology, Female**
**Sacramento Radiology Med Group**

C-Arm with Flat Detector
Excellent Image Quality and Ease of for Cardiac and Orthopedic Surgery.
www.Philips.com/VeradiusN AdChoices ▷

**Profile Reviews Locations Education**
**Top rated Popular Nearby**

www.centeronlisepreplacemen...

**Free hosted PACS/telerads**
Free solution to store DICOM online Unify worklist from multiple sites
www.OnePacs.com

**Primary Care Physician**
fully equipped new practice Accepting new patients
www.khattabmd.com

| | | | | | |
|---|---|---|---|---|---|
| DR. MOOREFIELD, JAMES MCCREAY M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1295763514 |
| DR. MUKUNO, DWIGHT HISAYUKI M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1790720019 |
| NIEVES, MIGUEL ANGEL M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1679505333 |
| PARSONS, PAUL MILO M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1346272010 |
| WHITE, ARTHUR ALAN M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1740212414 |
| DR. WINN, JOHN NGUYEN M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1871795500 |
| WITZTUM, KATHRYN FLAKE M.D. | Carmichael, CA | 95608 | Neuroradiology | Female | 1487683603 |
| WU, THOMAS YUCHIE M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1366474033 |

NPI Number Lookup or Search by Name

Home • Search NPI Registry • Find Doctors • Organizations • Taxonomy Codes • FAQs • Search • Privacy Policy

*Public Schools in California*



# NPIdb 🦫 NPI Number Lookup for Doctors

like 294

[ Search ]

Home   Search NPI Registry   Find Doctors   Organizations   Taxonomy Codes   FAQs   Search                Jun 14, 2012

## Find a doctor or health care provider in Carmichael, CA

[ Search ]

### Doctors / Neuroradiology

A radiologist who diagnoses and treats diseases utilizing imaging procedures as they relate to the brain, spine and spinal cord, head, neck and organs of special sense in adults and children.

**See doctors below ↓**

**Top SoCal Spine Surgeon** www.drwimita.com
Board Certified Neurosurgeon Complex Spine and
Brain Disorders

**MTI College - Sacramento** MTICollege.edu
Accredited Medical Tech School. 90% Job
Placement, Voted Best College!

**Bulging Disc Relief** RosevilleBackCenter.com
Breakthrough Treatment Offers Hope For Bulging
Disc Pain Sufferers

**Radiology Services** www.NightShiftRadiology.com
On-Call Teleradiology Services w/ Equipment
Included. Call Us Today!

AdChoices ▷



Get started today at a Carrington College campus near you.

▼ LEARN MORE ▶

CARRINGTON COLLEGE



22 records found.
**NPI Number Lookup** or **Search by Name**

### Search Filter - Change Specialty

**Filter by zip code**
* « **Back**
* **95608**
* « **Back**

Hint - Do you know the name of a doctor but not the specialty? Click **here** to **search doctors by name only**

AdChoices ▷

**AARP® Medicare Supplement**
Ins Plans by UnitedHealthcare Ins Co. Request a Free Guide. Go Long.
www.GoLong.com/AARP-Med

**Free Online CME Courses**
Free Online CME/CE Courses. Peer Reviewed & ACCME Accredited.
www.ProjectsInKnowledge.com

**Disc Replacement Surgery**
We Are Experts In Disc Replacement Treamment For Back Disc Pain

| Providers Name | City/State | Zip | Specialty | Gender | NPI Number |
| --- | --- | --- | --- | --- | --- |
| DR. BEMRICK, ROBERT JAMES II M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1003843558 |
| DR. BHATIA, AMARDEEP SINGH M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1083641542 |
| DR. BROWN, PAUL RICHARD M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1508892621 |
| DR. CHANG, GARRICK CHI-REY M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1952308041 |
| DR. DEOL, PARMINDER SINGH M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1649472374 |
| MR. DUC, VUONG MINH MD | Carmichael, CA | 95608 | Neuroradiology | Male | 1366647737 |
| DR. FELLMETH, BRIAN D M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1477589091 |
| DR. GILBERT, ROGER MILLS M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1518964642 |
| DR. HAINES, PHILIP OLIVER M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1184660565 |
| DR. JAMES, PETER LEE M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1588692792 |
| DR. LEE, TIMOTHY DAVID MD | Carmichael, CA | 95608 | Neuroradiology | Male | 1790728020 |
| DR. LI, FRANKLIN M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1447288725 |
| LUH, GEORGE M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1740213214 |
| DR. MARTEN, BRIAN RODNEY M.D. | Carmichael, CA | 95608 | Neuroradiology | Male | 1821029216 |

'12

**Compare Dr. Witztum**

*Top rated Neuroradiology in Sacramento, CA*

- Dr. Jonathan Breslau, MD ☆☆☆☆☆
- Dr. John N Winn, MD ☆☆☆☆☆
- Dr. Larry-stuart Deutsch, MD ☆☆☆☆☆
- Dr. Lewis T Dudley, MD ☆☆☆☆☆
- Dr. Miguel A Nieves, MD ☆☆☆☆☆

**Compare Dr. Witztum**

*Popular rated Neuroradiology in Sacramento, CA*

- Dr. Matthew Bobinski, MD ☆☆☆☆☆
- Dr. James A Brunberg, MD ☆☆☆☆☆
- Dr. Govind Mukundan, MD ☆☆☆☆☆
- Dr. David D Gover, MD ☆☆☆☆☆
- Dr. Carlos Martinot, MD ☆☆☆☆☆

**Compare Dr. Witztum**

*Nearby rated Neuroradiology in Sacramento, CA*

- Dr. David J Seidenwurm, MD ☆☆☆☆☆
- Dr. David F Winfield, MD ☆☆☆☆☆
- Dr. Ezell Askew, MD ☆☆☆☆☆
- Dr. Don C Loomer, MD ☆☆☆☆☆
- Dr. Arthur B Dublin, MD ☆☆☆☆☆

**Neuroradiology**
**Primary specialty -** **Neuroradiology** 🔊

**Physical address**

~~[redacted]~~
**Phone:** ~~[redacted]~~

**Gender -** Female
**School -** Washington Univ Sch Of Med, St Louis Mo 63110

ealpth.com/doctors/kathryn-witztum-952873/

+You    Images    Maps    Play    YouTube    News    Gmail    Documents    Calendar    More

witztum pediatric radiologist                                                    Sign in

## Search

About 10,100 results (0.30 seconds)

Web

Images

Maps

Videos

News

Shopping

More

Springdale, AR
Change location

Show search tools

Ad related to witztum pediatric radiologist                    Why this ad?

**Find a Mercy Pediatrician – More Personal. More Convenient.**
Get A Great Mercy Pediatrician Now
    Search by Physician's Name - Search by Specialty - Find a Doctor in My Area

**Dr. Joseph Witztum, MD - Internal Medicine, Diabetes Specialist ...**

La Jolla CA - Internal Medicine Physician
Review detailed information on Dr. Witztum's experience and background in medicine
... Pediatric Pulmonology, Pediatric Radiology, Pediatric Rehabilitation ...

**Dr. Joseph L. Witztum - Consumers' CHECKBOOK**

Dr. Joseph L. Witztum, Endocrinology, 9500 Gilman Dr La Jolla, CA, Nonprofit,
independent, doctor ratings, reviews, and advice. Endocrinologists and other ...

**Literature in pediatric radiology**

Literature in pediatric radiology (continued from p. 189). Malania di Gaucher ..... Taylor
A, Kipper MS, Witztum K, Greenspan G, Kan M  (1982) Abnormal 99 m ...

**Pediatric Radiology Specialists - Doctors in Carmichael, CA**

22 records – Doctors / Pediatric Radiology specialists in Carmichael, California
Search nationwide for doctors specializing in Pediatric Radiology  ... WITZTUM,
KATHRYN FLAKE, M.D., Carmichael, CA  95608, Pediatric Radiology, Female ...

**Radiologists in Sacramento, California | Top 259 Best Radiology ...**

Of the 100 Radiologists in Sacramento shown on this page: 98 Board certified ....
Diagnostic Radiology. Radiology, Pediatric Radiology .... Dr Kathryn Witztum ...

**Radiology (Medical Imaging) - Diagnostic Radiology Specialists: Dr ...**

200+ items – Doctors specializing in Diagnostic Radiology: Dr Williams – Dr
Vickie L Williams, MD Rate Dr  Williams View Dr, Williams's profile
Terri A Williams-Weekes, MD Rate Dr  Williams-Weekes View Dr, Williams ...

**Nuclear Medicine Doctors in Fayetteville, AR | DocSpot**

Dr. Kathryn Witztum is a diagnostic radiologist and nuclear medicine specialist ...
Vascular & Interventional Radiology, Radiation Oncology, Pediatric Radiology, .

**Enlarged common hepatic duct secondary to morphine in a neonate ...**

Pediatric Radiology .  Taylor A, Kipper MS, Witztum K, Greenspan G, Kan M (1982)
Abnormal 99 m Tc-PIPIDA scans mistaken for common duct obstruction.

**Similar articles in PubMed - PubMed Result**

5. Taylor A Jr, Kipper MS, Witztum K, Greenspan G, Kan M, Abnormal 99mTc-PIPIDA
scans mistaken for common duct obstruction. Radiology. 1982 Jul ...

**Doctors in Fayetteville, AR who treat or diagnose Pediatric Cerebral ...**

Find a doctor who treats or diagnoses Pediatric Cerebral Aneurysms in Fayetteville,
AR  .  Radiologist  Kathryn Flake Witztum MD, Diagnostic Radiologist ..

Ad related to witztum pediatric radiologist                    Why this ad?

7/12/2012

| | | | | | |
|---|---|---|---|---|---|
| LUH, GEORGE MD | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1740213214 |
| DR. MARTEN, BRIAN RODNEY M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1321039216 |
| DR. MOOREFIELD, JAMES MCCREAY M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1295760514 |
| DR. MUKUNO, DWIGHT HISAYUKI M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1790720019 |
| NIEVES, MIGUEL ANGEL MD | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1679605333 |
| PARSONS, PAUL MILO M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1346272010 |
| WHITE, ARTHUR ALAN M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1740212414 |
| DR. WINN, JOHN NGUYEN M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1371795500 |
| WITZTUM, KATHRYN FLAKE M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Female | 1487683603 |
| WU, THOMAS YUCHIE M.D. | Carmichael, CA | 95608 | Pediatric Radiology | Male | 1366474033 |

NPI Number Lookup or Search by Name

Home • NPI Lookup • Find Doctors • Organizations • Taxonomy Codes • FAQs • Search • Privacy Policy

Public Schools in California

npidb.org/doctors/..../carmichael/